[This opinion has been published in *Ohio Official Reports* at 73 Ohio St.3d 371.]

COMMUNITY MUTUAL INSURANCE COMPANY, APPELLEE AND CROSS-APPELLANT, *v*. TRACY, TAX COMMISSIONER, APPELLANT AND CROSS-APPELLEE.

[Cite as *Community Mut. Ins. Co. v. Tracy*, 1995-Ohio-296.]

*Taxation—Sales and use taxes—Health insurance company's transaction with company that coded and organized litigation documents into a computer-accessible format not taxable—Health insurance company's transactions with company that provided information on adjudication of claims on computer tapes and transaction with company that transferred a license to use application software are taxable.*

(No. 94-705—Submitted June 6, 1995—Decided August 30, 1995.)

APPEAL and CROSS-APPEAL from the Board of Tax Appeals, No. 91-J-418.

———————————

{¶ 1} Community Mutual Insurance Company ("Community Mutual"), appellee and cross-appellant, a health insurance company based in Cincinnati, is a member of the National Association of Blue Cross/Blue Shield organizations. The Tax Commissioner, appellant and cross-appellee, audited Community Mutual's purchases from April 1, 1985 through September 30, 1985. He assessed Community Mutual on transactions with (1) Document Automation Corporation, which coded and organized litigation documents into a computer-accessible format, (2) Nationwide Insurance Company, which provided information on its adjudication of claims on computer tapes, (3) and Business Systems Corporation of America, which transferred a license to use application software to Community Mutual. On appeal, the Board of Tax Appeals found that these transactions were exempt legal or personal services.

**{¶ 2}** This cause is now before this court upon an appeal and cross-appeal as of right.

―――――――――

*Vorys, Sater, Seymour & Pease, Raymond D. Anderson* and *Anthony L. Ehler*, for appellee and cross-appellant.

*Betty D. Montgomery*, Attorney General, and *Lawrence D. Pratt*, Assistant Attorney General, for appellant and cross-appellee.

―――――――――

**Per Curiam.**

**{¶ 3}** We affirm the BTA's decision as to the transaction with Data Automation Corporation and reverse its decision as to the transactions with Nationwide Insurance Company and Business Systems Corporation of America.

## I

## LITIGATION SUPPORT

### A. FACTS

**{¶ 4}** The National Association of Blue Cross/Blue Shield organizations sued Community Mutual for trademark infringement and antitrust violations. In responding to discovery, Community Mutual's attorneys needed to code one hundred thirty-five banker boxes of records. At first, Community Mutual's attorneys, their paralegals, and law students performed this coding. However, the attorneys needed quicker progress, and they hired Document Automation Corporation ("DAC").

**{¶ 5}** Following a manual prepared by Community Mutual's attorneys and under their supervision, DAC coded the documents so that the attorneys could readily interpret them. DAC coded the documents bibliographically by names mentioned, date, author, recipient, and relationship of an author.

**{¶ 6}** DAC also summarily or subjectively coded the documents. In this coding, the coder reviewed and abstracted the document, pulling specific

information from the document per the instructions of the attorneys or paralegals. DAC coded four different fields required by the attorneys. First, the attorneys required the coders to determine whether an attorney-client privilege applied to the document. Second, the coders determined whether the documents fell into one of twelve legal or factual categories. Third, the coders determined whether the document had some factual or legal significance to the matters in the case. Fourth, the coders prepared a summary indicating the supporting and damaging information they found within the document and briefly describing the document in a "memo" field, to be searched like Lexis or Westlaw. DAC placed this information on computer-readable media and delivered a tape to the attorneys, who downloaded the tape into their computer system. The attorneys, after settling the suit, now store the tape in their vault.

{¶ 7} DAC billed a charge to the law firm, which the firm billed to Community Mutual. The commissioner assessed this charge. In its decision, the BTA found that these services qualified as "legal services," because DAC analyzed the material to categorize it properly. Thus, the BTA found these to be exempt personal services to which automatic data processing and computer services ("ADP and computer services") were incidental or supplemental.

## B. ANALYSIS

{¶ 8} Former R.C. 5739.01(B)(3)(e) defined "sale" and "selling" to include transactions in which:

"Automatic data processing and computer services are or are to be provided for use in business when the true object of the transaction is the receipt by the consumer of automatic data processing or computer services rather than the receipt of personal or professional services to which automatic data processing or computer services are incidental or supplemental. * * *"

{¶ 9} Former R.C. 5739.01(Y)(1) defines "automatic data processing and computer services" as:

"[P]rocessing of others' data, including keypunching or similar data entry services together with verification thereof; providing access to computer equipment for the purpose of processing data or examining or acquiring data stored in or accessible to such computer equipment; and services consisting of specifying computer hardware configurations and evaluating technical processing characteristics, computer programming, and training of computer programmers and operators, provided in conjunction with and to support the sale, lease, or operation of taxable computer equipment or systems. 'Automatic data processing and computer services' shall not include personal or professional services.

"(2) As used in divisions (B)(3)(e) and (Y)(1) of this section, 'personal and professional services' means all services other than automatic data processing and computer services, including but not limited to:

"(a) Accounting and legal services such as advice on tax matters, asset management, budgetary matters, quality control, information security, and auditing and any other situation where the service provider receives data or information and studies, alters, analyzes, interprets or adjusts such material[.]"

{¶ 10} The commissioner argues that only attorneys can provide legal services and that the disputed purchase is taxable because nonlawyers provided the interpretation and analysis in this case. Community Mutual responds that services provided by trained individuals acting under a lawyer's direct supervision qualify for this exemption.

{¶ 11} According to the evidence, DAC's service qualifies as legal services. Its employees received the documents, studied them, analyzed the documents to determine how to code them, and interpreted them for the lawyers. The attorneys relied on DAC to determine whether the document was privileged, whether it pertained to one of the twelve legal or factual categories, and whether it was significant to that category, and to summarize it for computer retrieval. These are typical actions that lawyers take in preparing a case for trial.

4

**{¶ 12}** As to the commissioner's argument that only lawyers can provide legal services, the argument ignores Canon 3 of the Code of Professional Responsibility. In EC 3-6, the code provides:

"A lawyer often delegates tasks to clerks, secretaries, and other lay persons. Such delegation is proper if the lawyer maintains a direct relationship with his client, supervises the delegated work, and has complete professional responsibility for the work product. This delegation enables a lawyer to render legal service more economically and efficiently."

**{¶ 13}** In fact, we recognized this practice and disciplined a lawyer for not properly supervising his office personnel. In *Disciplinary Counsel v. Ball* (1993), 67 Ohio St.3d 401, 404, 618 N.E. 2d 159, 161, we stated:

"Delegation of work to non-lawyers is essential to the efficient operation of any law office. But, delegation of duties cannot be tantamount to the relinquishment of responsibility by the lawyer. Supervision is critical in order that the interest of clients are effectively safeguarded. * * * It is the respondent's total failure to supervise any work done by his non-lawyer employee which is the gravamen of this case."

**{¶ 14}** Thus, laypersons can perform legal services if accomplished under an attorney's supervision. Consequently, the service that DAC performed for Community Mutual's attorneys is a professional, legal service, and the BTA's conclusion that the true object was the professional service to which ADP and computer services were incidental or supplemental is reasonable and lawful.

## II

### ADJUDICATION INFORMATION

#### A. FACTS

**{¶ 15}** Nationwide Insurance Company contracts with the federal Health Care Finance Administration to administer the federal Medicare Part B program. Nationwide receives a claim, assigns a control number to it, and forwards the claim

to its claims examiners, whom Nationwide trains in medical terminology and claims adjudication. The claims examiners study the claim and the file, and determine whether and how much to pay on the claim.

{¶ 16} Community Mutual provides supplementary Medifill B coverage. In this program, the Medicare claimant may receive additional benefits on a Medicare claim from Community Mutual. Community Mutual will receive information on Nationwide's ruling on the claim upon the claimant's authorization. Community Mutual will then pay supplementary benefits to the claimant if due.

{¶ 17} During the audit period, Community Mutual purchased this information from Nationwide at a charge established by the federal government. To receive the information on these adjudications, Community Mutual delivered an eligibility tape to Nationwide, which listed eligible claimants. Nationwide, with its computers, ran that tape against its beneficiary master file. When Nationwide found a match, it spun the information about the adjudication onto a tape, an Explanation of Medicare Benefits ("EOMB") tape, that it then sent to Community Mutual. Community Mutual could then determine what to pay on the supplementary claim. These EOMB transactions occurred weekly.

{¶ 18} The commissioner assessed tax on Nationwide's charges for these EOMB tapes. On appeal, the BTA, without actually determining that Nationwide provided Community Mutual a personal service, determined that the overriding purpose of the transaction was to obtain the information contained on the tapes and that the transaction was an exempt personal service.

## B. ANALYSIS

{¶ 19} In defining "sale" and "selling," R.C. 5739.01(B)(5) provides:

"Other than as provided in this section, 'sale' and 'selling' do not include professional, insurance, or personal service transactions which involve the transfer of tangible personal property as an inconsequential element, for which no separate charges are made."

**{¶ 20}** The commissioner maintains that this transaction is simply the mechanical retrieval of requested information from a pre-existing computer data base and the sale of this information on an encoded magnetic tape. He claims that this is not a personal service, and that the BTA erred in deciding whether an overriding purpose existed. Community Mutual claims that Nationwide sold it the skill of its trained individuals who adjudicated the claim. It also claims that this sale is the purchase of intangible personal property or, furthermore, an insurance service transaction.

**{¶ 21}** In *Emery Industries, Inc. v. Limbach* (1989), 43 Ohio St. 3d 134, 539 N.E. 2d 608, in which we formulated a new approach to personal service transactions, we noted that Ohio taxed transactions in tangible personal property and certain specified services. We continued to note that, until the General Assembly had recently begun to tax some personal services, "all services were excluded from the tax because, by definition, they were not sales and, thus, not retail sales, the basis for the tax." Under the personal services exception, "[h]owever, when inconsequential personal services accompanied a transfer of consequential tangible personal property and their charge was not separated from the charge for property, the service was taxed." *Id.* at 135, 539 N.E. 2d at 610.

**{¶ 22}** We reviewed the definition of "personal service" adopted in *Koch v. Kosydar* (1972), 32 Ohio St.2d 74, 61 O.O. 2d 329, 290 N.E. 847, paragraph one of the syllabus. We determined the definition to be lacking because it did not simply define a personal service; rather, it included a test for determining the inconsequentiality of the tangible personal property. Thus, we decided to remove that test from the definition. In paragraph one of the syllabus in *Emery*, we defined a "personal service" as:

"Any intellectual or manual act involving a recognized skill performed by a person who is specifically engaged by the purchaser to perform the act. (*Koch v. Kosydar* [1972], 32 Ohio St. 2d 74, 61 O.O.2d 329, 290 N.E.2d 847, modified.)"

**{¶ 23}** In this case, the BTA apparently assumed a personal service occurred and went directly to deciding, under paragraph four of the syllabus of *Emery*, what the overriding purpose of the purchaser was in the transaction. However, under paragraph three of the syllabus in *Emery*, if no personal service occurred, the entire transaction is taxable.

**{¶ 24}** According to the definition of "personal service" contained in *Emery*, Nationwide did not perform a personal service for Community Mutual. Nationwide did not direct its intellectual effort to profit Community Mutual; Nationwide had, in adjudicating the claim, directed this effort to determine what, if any, benefits to pay its claimants. It simply reported to Community Mutual the results of these intellectual acts. This action does not appear far different from a legal publishing company's selling casebooks containing our decisions. We employed intellectual effort in resolving the controversies presented us by the parties. However, the sale of the published reports of the decisions to the legal community is the transfer of tangible personal property and a taxable sale. Thus, we reverse the BTA's decision.

**{¶ 25}** We also conclude that Community Mutual did not purchase intangible property. Virtually all books and recordings memorialize intangible efforts by the author or artist. Recording and marketing the intellectual effort render that effort more economically available to purchasers. Nevertheless, the medium on which the intellectual effort is transferred is tangible and subject to the sales tax. If the transaction contains a "personal service," as defined in *Emery*, it may be exempt if the purchaser's overriding purpose is to obtain the personal service. Here, no personal service occurred.

**{¶ 26}** As to Community Mutual's argument that this is an insurance transaction, Community Mutual purchased taped adjudication information. This was the purchase of tangible property; it was not the sale of an insurance service.

**III**

## APPLICATION SOFTWARE

### A.  FACTS

**{¶ 27}** Community Mutual desired to improve its business operations.  It studied application software programs created by Electronic Data Systems, McDonnell-Douglas, and Business Systems Corporation of America.  It purchased a license to use the program offered by Business Systems.

**{¶ 28}** Business Systems began business as a committee of the National Association of Blue Cross/Blue Shield organizations.  It was to develop software to improve its members' operations.  At some point the association established Business Systems separately from the association, and Business Systems continued to develop and then market software.  Business Systems developed a computer program it called "Long Range Systems Planning" ("LRSP"), which it sold to Community Mutual.  LRSP will allow the subscriber's computer system to process group and subscriber records and transactions, maintain group and subscriber data, handle billing of groups and subscribers, process claims, store records on physicians, store pricing schedules, accumulate statistical records for later analysis, and produce checks and explanations of benefits.  LRSP is application software; it solves business problems for Community Mutual.  It does not manage the hardware of the systems; hence, it is not system software.

**{¶ 29}** Community Mutual was the seventh or eighth association member to purchase LRSP, and it paid $1,250,000 for the license to use LRSP.  Community Mutual, paid only $210,000 in the assessment period and was assessed only on that amount.  Community Mutual received encoded magnetic tapes containing the LRSP program.  For this fee, Business Systems also installed and implemented the program and provided hard-copy documentation.  In installing LRSP, Business Systems agreed to establish the program in Community Mutual's computer system and perform baseline tests with satisfactory results.  In implementing LRSP, Business Systems agreed to bring the program up to operational use and to consult

with Community Mutual in so doing. Community Mutual provided no evidence on the extent of this installation and implementation.

{¶ 30} During the audit period, Community Mutual also purchased enhancements, known as a "customer request," or a "CR," from Business Systems, which cost Community Mutual at least an additional $314,000. Business Systems later bundled these CRs with LRSP to sell a higher-level LRSP.

{¶ 31} After installation, Community Mutual, in separate billings, paid Business Systems $1,023,048.34 and several other programmers $2,113,403.72 to tailor LRSP to Community Mutual's computer environment.

{¶ 32} The commissioner assessed tax against the $210,000 installment for the LRSP and against the amount for CRs; it did not assess Community Mutual for the separately billed programming charges. The BTA, in reversing the commissioner, determined that the overriding purpose in the transaction was to obtain the information contained on the software without first determining whether a personal service existed.

## B. ANALYSIS

{¶ 33} The commissioner maintains that Community Mutual purchased tangible personal property in the form of taped computer software and supporting hard-copy documentation and did not purchase a personal service. Community Mutual, on the other hand, maintains that it purchased a personal service to which computer tapes are an inconsequential tangible element. It also maintains that computer software is intangible property.

{¶ 34} Under R.C. 5739.01(B)(1), "sale" and "selling" include "all transactions by which *** a license to use or consume tangible personal property is or is to be granted[.]" Under *Interactive Information Systems, Inc. v. Limbach* (1985), 18 Ohio St.3d 309, 18 OBR 356, 480 N.E. 2d 1124, encoded magnetic tapes are tangible personal property. Moreover, as we earlier mentioned, a "personal service" is "any intellectual or manual act involving a recognized skill performed

by a person who is specifically engaged by the purchaser to perform the act." *Emery Industries, Inc. v. Limbach, supra,* paragraph one of the syllabus.

{¶ 35} Community Mutual did not specifically engage Business Systems to design LRSP for Community Mutual. Business Systems had designed and developed this program to satisfy the needs of Blue Cross/Blue Shield members generally. It sold the license to use this program to Community Mutual and delivered the program to Community Mutual on magnetic tapes. Under *Emery* and *Interactive Information Systems, Inc.,* Community Mutual did not receive a personal service from Business Systems; Community Mutual received tangible personal property.

{¶ 36} Furthermore, we do not adopt Community Mutual's argument that we should consider all the charges that Community Mutual paid to tailor the system to its computer environment. The purpose of *Emery's* true object test is to determine the consequentiality of personal property when a mixed transaction is at issue and no separate charges have been made for the service or the property. Here, Community Mutual paid a separate price for the property and another price for the service in separate billings. The transactions do not invoke the true object test.

{¶ 37} Accordingly, we affirm, as reasonable and lawful, the BTA's decision in exempting the purchases of litigation support from DAC and reverse, as unlawful, the BTA's decisions as to the purchases of information from Nationwide and application software from Business Systems.

*Decision affirmed in part*
*and reversed in part.*

MOYER, C.J., DOUGLAS, WRIGHT, RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

_____