CASTLE AVIATION, INC., APPELLANT AND CROSS-APPELLEE, *v*. WILKINS, TAX COMMR., APPELLEE AND CROSS-APPELLANT.

[Cite as *Castle Aviation, Inc. v. Wilkins,*
109 Ohio St.3d 290, 2006-Ohio-2420.]

(No. 2005–0304—Submitted January 11, 2006—Decided May 31, 2006.)

---

ALICE ROBIE RESNICK, J.

{¶ 1} The Tax Commissioner has assessed a use tax against purchases of fuel, aircraft leases, maps, supplies, parts, repairs, and publications made by appellant and cross-appellee, Castle Aviation, Inc. ("Castle"), for the time period January 1,

1996, through December 31, 1999. Castle contends that its operations qualify it as a public utility and, therefore, that the assessed purchases should be excepted from the use tax. We disagree and affirm the decision of the Board of Tax Appeals ("BTA").

{¶ 2} Castle is a small air carrier operating out of the Akron/Canton airport, whose business consists mostly of transporting freight rather than passengers. During the audit period, Castle operated eight single- and twin-engine planes having at most nine seats.

{¶ 3} Subsequent to the Tax Commissioner's assessment, Castle filed a petition for reassessment. The Tax Commissioner denied the petition for reassessment and affirmed his assessment, finding that Castle lacked the necessary characteristics to categorize it as a public utility.

{¶ 4} Castle appealed the Tax Commissioner's final determination to the BTA. At the BTA hearing, Castle presented three witnesses.

{¶ 5} Castle's first witness was Mike Weitzel, the regional circulation manager for the New York Times. Weitzel testified that the Times had negotiated a fixed-price agreement with Castle to transport the Monday through Saturday editions of the Times, which are printed in Canton, to Louisville, Kentucky, and Toronto, Ontario.

{¶ 6} Castle's next witness was its owner and president, Michael Grossmann, who testified that during the audit period, Castle had an air carrier certificate from the Federal Aviation Administration ("FAA"), which authorized it to operate as an air carrier and to conduct common-carriage operations. Grossmann stated that Castle was a charter operator and that there were about 3,000 other charter operators in the country.

{¶ 7} Grossmann testified that Castle holds itself out to the public as being capable of handling cargo and charter services. Castle lists its services in a trade publication known as the Air Charter Guide and in the Yellow Pages in Cleveland, Akron, and Canton. During the latter part of the audit period, Castle also initiated a web site. Although Castle listed prices in the Air Charter Guide, Grossmann pointed out that its rates are negotiable in certain situations and that freight brokers, from which Castle derives most of its freight business, are generally given a five to ten percent discount on the retail rates. Castle does not post any of its rates with any governmental agency.

{¶ 8} Castle's final witness was Michael Fleming, a representative of a management-consulting firm. Fleming, whose specialty is the aviation industry, testified primarily about applicable federal regulations to explain why Castle is classified as a "Part 135" air carrier and what that means.

{¶ 9} The Board of Tax Appeals affirmed the Tax Commissioner's determination that Castle did not meet the criteria of a public utility.

{¶ 10} Castle's operations are classified as those of an "air taxi operator," which is a classification of air carrier that engages in the air transportation of persons or property, does not directly or indirectly use large aircraft, and does not hold a certificate of public convenience and necessity. Section 298.3, Title 14, C.F.R. The term "large aircraft" is defined by Section 298.2, Title 14, C.F.R. as any aircraft designed to have a maximum passenger capacity of more than 60 seats or a maximum payload capacity of more than 18,000 pounds.

{¶ 11} Before an aircraft owner can provide air-transportation service as an air carrier, it must obtain separate authorization or exemption from two different sections of the United States Department of Transportation: (1) economic authority from the Office of the Secretary of Transportation in the form of a certificate of public convenience and necessity, Section 41102, Title 49, U.S.Code, and (2) safety authority from the FAA in the form of an air carrier certificate and operations specifications issued under either Part 121 or Part 135, Title 14, C.F.R. While Section 298.11, Title 14, C.F.R. provides that air taxi operations may be exempted from the economic requirement to obtain a certificate of public convenience and necessity, there is no prohibition against an air taxi operator voluntarily choosing to obtain a certificate of public convenience and necessity.

{¶ 12} If a carrier chooses to obtain a certificate of public convenience and necessity, it must undergo certain reviews by the Department of Transportation, including meeting a requirement that it be found fit, and must submit periodic financial and traffic reports and maintain a higher level of insurance coverage. Section 41102, Title 49, U.S.Code. An air carrier that has obtained a certificate of public necessity and convenience is commonly referred to as a "certified air carrier." Castle has elected, under Section 298.11, Title 14, C.F.R. to be exempted from the requirement to obtain a certificate of public convenience and necessity. As a result, Castle merely has to register with the Department of Transportation and submit proof of insurance coverage. Section 298.3, Title 14, C.F.R.

{¶ 13} Apart from the issue of the certificate of public necessity and convenience, which is controlled by the Department of Transportation, is the question of safety rules, which are determined by the FAA. There are two classes of operating safety rules, Part 121 and Part 135 of Title 14, C.F.R. The requirements set forth in Part 135 are less rigorous than those imposed under Part 121.

{¶ 14} Section 119.21, Title 14, C.F.R. sets forth the criteria to determine whether Part 121 or Part 135 rules are applicable to a given operation. Because of the types of planes Castle operates and the way in which it operates, its operations are conducted under the less rigorous safety requirements of Part 135.

If Castle wished to do so, it could subject itself to the more rigorous Part 121 rules, but it has chosen not to do so.

{¶ 15} Based on these facts concerning Castle's operations, we must determine whether its operations meet the criteria of being a public utility for use tax purposes. Although the tax assessed was a use tax, only the sales tax statutes will be referred to in this opinion, because R.C. 5741.02(C)(2) provides that the use tax does not apply to property or services the acquisition of which, if made in Ohio, would not be subject to the sales tax imposed by R.C. 5739.01 to 5739.31.

{¶ 16} The relevant sales tax statute under which Castle contends that its purchases should be excepted is former R.C. 5739.01(E)(2), which stated:

{¶ 17} "(E) 'Retail sale' and 'sales at retail' include all sales except those in which the purpose of the consumer is:

{¶ 18} "(1) * * *

{¶ 19} "(2) * * * to use or consume the thing transferred * * * directly in the rendition of a public utility service * * *." 1995 Am.H.B. No. 61, 146 Ohio Laws, Part I, 407.

{¶ 20} While the term "public utility" is defined in three titles of the Revised Code, it is not defined for the purposes of the sales tax provisions contained in R.C. Chapter 5739. E.g., R.C. 1707.01(M), 4905.02, and 5727.01(A). In *Vernon v. Warner Amex Cable Communications, Inc.* (1986), 25 Ohio St.3d 117, 119, 25 OBR 164, 495 N.E.2d 374, the court rejected the assertion that the concept of a public utility was limited to those types of entities defined as public utilities in the public utility statutes in R.C. Chapter 4905 or in the public utility tax statutes in R.C. Chapter 5727, stating that "those definitions are relevant solely to the statutory chapters in which they are located." All of the other definitions of "public utility" in the Revised Code are also limited to their chapters and are therefore irrelevant.

{¶ 21} One of the first cases to consider the sales and use tax exception for public utilities was *Midwest Haulers, Inc. v. Glander* (1948), 150 Ohio St. 402, 38 O.O. 261, 83 N.E.2d 53. The taxpayer in *Midwest Haulers* was apparently a certified common carrier throughout the audit period. However, the mere holding of a certificate to operate as a regulated common carrier was not sufficient, in and of itself, to except the taxpayer from the sales and use tax. The court held that the sales and use tax exception was applicable to Midwest's operations only after it began operations as a certified common carrier.

{¶ 22} In a subsequent tax case, *Pittsburgh & Conneaut Dock Co. v. Limbach* (1985), 18 Ohio St.3d 320, 18 OBR 365, 481 N.E.2d 579, a taxpayer that was not regulated by any governmental agency sought to except its purchases from sales and use tax. The taxpayer voluntarily filed its rates with the Interstate

Commerce Commission. The taxpayer claimed that it met the definition of a common carrier set forth by the court in *Midwest Haulers, Inc. v. Glander* because it served an indefinite public and the public had a right to demand its services. However, the court held that the taxpayer was not a public utility for purposes of the tax exception, because the taxpayer did not need regulatory approval to engage in its business and the public's right to demand the taxpayer's services was not comparable to the right to demand those of a public utility. *Pittsburgh & Conneaut Dock Co.*, 18 Ohio St.3d at 323, 18 OBR 365, 481 N.E.2d 579.

{¶ 23} Castle places great reliance on this court's decision in *Trans World Airlines v. Porterfield* (1970), 22 Ohio St.2d 177, 51 O.O.2d 238, 258 N.E.2d 458, in which an airline was held to be a public utility for purposes of R.C. 5739.01(E)(2). *Trans World Airlines* was one of the first cases in which an entity that was not regulated by the state of Ohio claimed to be a public utility for sales tax purposes. Trans World Airlines held a certificate of public convenience and necessity granted by the Civil Aeronautics Board; however, the court's decision was not based on that fact. The court's decision was based on Tax Commissioner's Rule TX–13–01, which defined "public utility service" for purposes of the sales and use tax to include "the furnishing of * * * airplane * * * services to, from, through or within this State, and any other activity which constitutes a public utility service in fact." Tax Commissioner's Rule TX–13–01 further required that "[i]n all cases, the service must be rendered so as to confer upon any member of the general public a legally enforceable right to demand same * * *." Because Tax Commissioner's Rule TX–13–01 was rescinded in the mid–1970s, we place little value on *Trans World Airlines* as precedent for the purpose of determining whether Castle is a public utility for sales and use tax purposes.

{¶ 24} In another tax case, *Manfredi Motor Transit Co. v. Limbach* (1988), 35 Ohio St.3d 73, 76, 518 N.E.2d 936, the court stated that "[t]he first question to be answered [in applying R.C. 5739.01(E)(2) ] is whether the taxpayer is a *regulated* public utility service * * *." (Emphasis added.)

{¶ 25} In *Inland Refuse Transfer Co. v. Limbach* (1990), 53 Ohio St.3d 10, 558 N.E.2d 42, a private rubbish hauler claimed to be a public utility for sales and use tax purposes. Inland's claim was based on the fact that it contracted with the city of Cleveland, which regulated its business hours and inspected its vehicles. The court explained *Pittsburgh & Conneaut Dock Co.*, 18 Ohio St.3d 320, 18 OBR 365, 481 N.E.2d 579, as having held that "only a public utility service that is so important to the public interest that special regulation and control [have] been imposed upon it may have its purchases excepted." 53 Ohio St.3d at 11, 558 N.E.2d 42. The court further explained, "[T]he required regulation equates to control of the taxpayer's business," and went on to state that since the taxpayer

was not so regulated and could cease business at any time, the public could not demand and receive the taxpayer's services, as it could if the taxpayer were specially regulated. Id. at 12, 558 N.E.2d 42.

{¶ 26} As an example of the requisite control, the court in *Inland Refuse Transfer Co.* cited R.C. 4921.04, which gave the Public Utilities Commission of Ohio the power to fix rates, to regulate service and the safety of operations, and to regulate the relationship between motor transport companies and the public. As another example, the court noted R.C. 4921.07, which required companies to secure a certificate of convenience and necessity from the Public Utilities Commission. The court found that the regulation required for public utility status by *Pittsburgh & Conneaut Dock Co.* did not exist in Inland's case. *Inland Refuse Transfer Co.*, 53 Ohio St.3d at 12, 558 N.E.2d 42.

{¶ 27} We acknowledge that there are many different criteria that can be used to determine whether an entity qualifies as a public utility in a given situation. See, e.g., *A & B Refuse Disposers, Inc. v. Ravenna Twp. Bd. of Trustees* (1992), 64 Ohio St.3d 385, 596 N.E.2d 423 (involving local zoning restrictions). Nevertheless, the preceding review of tax cases shows that the court has consistently found that one of the most important criteria, if not the most important, for the application of R.C. 5739.01(E)(2) to the rendition of a public utility service is special regulation and control by a governmental regulatory agency.

{¶ 28} The evidence in this case fails to show that Castle's operations meet the criterion of being under special regulation and control by a governmental regulatory agency. Admittedly, Castle applied for and was granted an air carrier certificate. However, the granting of the air carrier certificate was not shown to have been anything other than a perfunctory administrative function by the FAA. There was no evidence that any governmental agency set any requirements, other than safety, to govern Castle's business operations. Therefore, we find that Castle's operations do not qualify it for the exception set forth in R.C. 5739.01(E)(2).

{¶ 29} Castle's operations are similar to many other private business operations in that they must comply with various regulations, e.g., safety or environmental regulations, in order for the business to operate; however, those regulations do not control the relation between the business and the public as its customers. In a nontax case, *A & B Refuse Disposers, Inc.*, the court rejected the assertion that any business that simply claims that its services are open to the public can be categorized as a public utility, stating: "This view is an unduly expansive construction of our holding [in *Marano v. Gibbs* (1989), 45 Ohio St.3d 310, 544 N.E.2d 635] in that such a definition encompasses traditional private business enterprises which are, in various degrees, regulated by diverse public

authorities, *e.g.*, dry cleaners, restaurants, and grocery stores. They are not and should not be deemed public utilities." 64 Ohio St.3d at 389, 596 N.E.2d 423.

{¶ 30} In its notice of appeal to this court, Castle set forth its second claim of error as follows:

{¶ 31} "2. The imposition of the use tax on Castle's purchases described in paragraph 1 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the Equal Protection Clause of the Ohio Constitution, Article I, § 2."

{¶ 32} Castle contends that it was denied equal protection because—according to Castle's brief—airlines operating larger planes are treated as public utilities while it is not. As a result, Castle argues that this is a tax classification that distinguishes between air carriers based on the size of the planes, rather than the nature of the service provided, and that the classification therefore does not further a legitimate state interest and cannot withstand an equal protection challenge.

{¶ 33} Before considering Castle's second claim of error we must consider the Tax Commissioner's cross-appeal. In his notice of cross-appeal, the Tax Commissioner contends, "The BTA erred by failing to dismiss Castle Aviation Inc.'s (Castle's) broad, vague claim in numbered paragraph 2 (two) of Castle's Notice of Appeal to the BTA * * *. The BTA should have dismissed on the basis that such claim failed to specify error, as jurisdictionally required pursuant to R.C. 5717.02." The second claim of error in the notice of appeal Castle filed with the BTA is the same as the second claim of error in the notice of appeal it filed with this court, except for citation format.

{¶ 34} The syllabus of *Cleveland Gear Co. v. Limbach* (1988), 35 Ohio St.3d 229, 520 N.E.2d 188, sets forth the BTA's jurisdiction to handle constitutional challenges:

{¶ 35} "1. The Board of Tax Appeals is an administrative agency, a creature of statute, and is without jurisdiction to determine the constitutional validity of a statute.

{¶ 36} "2. The question of whether a tax statute is unconstitutional on its face may be raised initially in the Supreme Court or the court of appeals, although not previously raised before the Board of Tax Appeals.

{¶ 37} "3. The question of whether a tax statute is unconstitutional when applied to a particular state of facts must be raised in the notice of appeal to the Board of Tax Appeals, and the Board of Tax Appeals must receive evidence concerning this question if presented, even though the Board of Tax Appeals may not declare the statute unconstitutional." (Citations omitted.)

{¶ 38} The requirement for stating error to the BTA from a final determination of the Tax Commissioner is set forth in R.C. 5717.02, which provides that the notice of appeal "shall also specify the errors therein complained of." In *Queen City Valves v. Peck* (1954), 161 Ohio St. 579, 53 O.O. 430, 120 N.E.2d 310, the court held at the syllabus that "a notice of appeal which does not enumerate in definite and specific terms the precise errors claimed but uses language so broad and general that it might be employed in nearly any case is insufficient to meet the demands of the statute [R.C. 5717.02]." In *Lenart v. Lindley* (1980), 61 Ohio St.2d 110, 114, 15 O.O.3d 152, 399 N.E.2d 1222, the court stated, "In considering this question of specificity in the past, this court has held that R.C. 5717.02 is a jurisdictional enactment and that adherence to the conditions and procedure set forth in the statute is essential."

{¶ 39} The purpose of specifying error to the BTA, be the error constitutional or nonconstitutional, is to put the Tax Commissioner on notice as to the issues that will be contested. As this court stated in *Cleveland Gear Co.*, "[w]hen a statute is challenged on the basis that it is unconstitutional in its application, this court needs a record, and the proponent of the constitutionality of the statute needs notice and an opportunity to offer testimony supporting his or her view." 35 Ohio St.3d at 232, 520 N.E.2d 188. When a taxpayer merely makes an allegation in its notice of appeal to the BTA that the imposition of the use tax violates federal and state equal protection, there is no specificity and the allegation of error must fail under R.C. 5717.02. This court has said that it "has no disposition to be hypertechnical and to deny the right of appeal on captious grounds[,] but it cannot ignore statutory language which demands that certain conditions be met to confer jurisdiction upon an appellate tribunal." *Queen City Valves*, 161 Ohio St. at 583–584, 53 O.O. 430, 120 N.E.2d 310.

{¶ 40} Measured by the requirements of R.C. 5717.02, Castle's claim of unconstitutionality at the BTA was not specific. The assignment of error did not state which provision of the use tax violated the Equal Protection Clauses or how the application of the use tax violated its right to equal protection.

{¶ 41} Castle contends that the lack of any statutory reference in the second claim of error is cured by reference to its first claim of error. However, in its first claim of error Castle merely stated that it had been erroneously assessed a use tax on certain purchases that were exempt pursuant to R.C. 5739.01(E)(2) and other sales tax provisions. Even combining the first and second assignments of error fails to yield a specific claim of how the imposition of the use tax denies Castle equal protection. There is nothing in Castle's second claim of error in its notice of appeal to the BTA that would tie the facts of this case to an equal-protection-based constitutional claim. The wording of Castle's constitutional claim is so general that it could be used in almost every use tax case.

{¶ 42} In *Osborne Bros. Welding Supply, Inc. v. Limbach* (1988), 40 Ohio St.3d 175, 178, 532 N.E.2d 739, the court stated:

{¶ 43} "In its notice of appeal to the BTA, appellant did not specifically assign as error the failure of the Tax Commissioner to exempt transactions at issue pursuant to the packaging exemption. Consequently, no reviewing court, including this one, has jurisdiction to hear this error, for it must be specifically assigned in the notice of appeal."

{¶ 44} This court can consider claims of error only when they were properly raised before the BTA. Since the claim of constitutional error that Castle attempted to raise before the BTA did not meet the specificity requirements of R.C. 5717.02, Castle did not successfully invoke the jurisdiction of the BTA as to that claim of error. This court therefore has no jurisdiction to consider it.

{¶ 45} For all of the reasons set forth above, we find the decision of the BTA to be reasonable and lawful and affirm it.

Decision affirmed.

MOYER, C.J., LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

PFEIFER, J., concurs in judgment only.

―――――――――

Buckingham, Doolittle & Burroughs, L.L.P., Steven A. Dimengo and David W. Hilkert, for appellant and cross-appellee.

Jim Petro, Attorney General, and Barton A. Hubbard, Assistant Attorney General, for appellee and cross-appellant.