[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Epic Aviation, L.L.C. v. Testa,* Slip Opinion No. 2016-Ohio-3392.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-3392

EPIC AVIATION, L.L.C., APPELLANT, *v.* TESTA, TAX COMMR., APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Epic Aviation, L.L.C. v. Testa,* Slip Opinion No. 2016-Ohio-3392.]

*Sales and use tax—R.C. 5739.02(B)(42)(a) and 5739.01(P)—Tax exemption for purchases used directly in the rendition of a public-utility service—Refund sought for sales tax paid on purchases of jet fuel by air-cargo carrier— Common-carrier test for exemption developed by case law—Purchases of fungibles are apportionable when used for both exempt and nonexempt purposes—Decision of Board of Tax Appeals vacated and cause remanded to tax commissioner for additional proceedings.*

(No. 2014-1691—Submitted January 5, 2016—Decided June 15, 2016.)

APPEAL from the Board of Tax Appeals, No. 2012-1557.

————————————————

**PFEIFER, J.**

{¶ 1} In this case, the tax commissioner, appellee, denied a claim for refund of sales tax brought by appellant, Epic Aviation, L.L.C. ("Epic"), a vendor of jet fuel, on behalf of its consumer, AirNet Systems, Inc. ("AirNet"), and the Board of Tax Appeals ("BTA") affirmed. Epic argues that AirNet purchased the jet fuel intending to use the fuel "directly in the rendition of a public utility service" under R.C. 5739.02(B)(42)(a) and that the purchases are therefore exempt from sales tax. AirNet does not hold a certificate of public convenience and necessity from the federal government, and the tax commissioner denied the exemption on the primary ground that AirNet's business was not sufficiently regulated to qualify as a "public utility service."

{¶ 2} Epic contends that the tax commissioner and the BTA placed too much emphasis on the lack of the certificate by essentially concluding that the certificate is a prerequisite to public-utility-service status. We agree with Epic. That portion of AirNet's business that consisted of providing regular package-delivery service at a reasonable and nondiscriminatory price according to preannounced schedules qualifies as "common carrier" service under our precedents and therefore as a "public utility service" under R.C. 5739.02(B)(42)(a) that is exempt from the sales tax. Accordingly, we vacate the BTA's decision and remand this cause to the tax commissioner with instructions that the tax commissioner allow evidence to be submitted to establish the portion of the fuel purchases pertaining to the common-carrier service.

## I. The Statutes at Issue

{¶ 3} Unless an exemption applies, jet fuel is taxable under the sales-tax law as tangible personal property transferred for consideration, R.C. 5739.01(B)(1), and under the use-tax law as tangible personal property subject to being used in the state, R.C. 5741.02(A)(1). In this case, Epic sold jet fuel to AirNet, collected sales tax on it, and remitted the tax to the state. Epic, as the vendor, brought a refund

claim, but the claim is on behalf of AirNet, and it is AirNet's operations that govern whether the exemption Epic seeks applies.

**{¶ 4}** R.C. 5739.02(B) states that the sales tax "does not apply to":

> (42)  Sales where the purpose of the purchaser is to do any of the following:
>
> (a)  * * * use or consume the thing transferred * * * directly in the rendition of a public utility service * * *.

**{¶ 5}** R.C. 5739.01(P) states that " '[u]sed directly in the rendition of a public utility service' means * * * fuel or power used in the production, transmission, transportation, or distribution system."  R.C. 5739.01(P) concludes by stating, "In this definition, 'public utility' includes a citizen of the United States holding, and required to hold, a certificate of public convenience and necessity issued under 49 U.S.C. 41102."  This final sentence of R.C. 5739.01(P) was added to the statute in 2006.  Am.Sub.H.B. No. 699, 151 Ohio Laws, Part V, 8537.

## II.  Background

**{¶ 6}** Epic seeks a $1,727,790.27 refund of sales tax paid by AirNet on its purchases of jet fuel from Epic during the time period of January 1, 2006, through April 30, 2009.  To support its claim, Epic provided a spreadsheet referencing invoice numbers and showing the dates and sale prices of fuel purchased, along with the tax amounts.  Epic also submitted a "spaghetti map" showing AirNet's hub-and-spoke system of flights and a copy of the schedule of AirNet's regularly scheduled cargo service, showing take-off times at departure airports and landing times at destination points.

**{¶ 7}** At the BTA hearing, AirNet's vice president of operations, Thomas Schaner, testified that AirNet's operations are based on a "super expedited" air-cargo-delivery system using the hub-and-spoke model, which was reflected on the

"spaghetti map" showing "all the connections where we have aircraft flying from airport to airport." He stated, "Anybody could * * * find our Web site, and they could book a shipment," after which "we would dispatch a courier, and we go pick up a shipment, bring it to the airport, put it on the airplane, get it out there, and then we would take it to the end point and then we would have couriers on the other end that would deliver the shipment."

{¶ 8} AirNet's delivery services are comprised of two primary segments— bank services and express services. The former include the immediate delivery of canceled checks, which has long been a core part of AirNet's business. Express services (described by Schaner as "everything that wasn't bank" service) include transporting time-sensitive radiopharmaceuticals (pharmaceuticals used in medical imaging and treatment that must often be used within hours of creation, before they break down), human tissue and organs for transplant, and blood for the American Red Cross. Schaner testified that AirNet received special approval and encouragement from the federal government after the terrorist attacks of September 11, 2001, to permit it to have access to air space to transport checks to maintain the operation of the country's banking system. AirNet also played a vital role in transporting emergency blood supplies immediately after those attacks.

## A. AirNet's FAA certification is under Part 135 of Title 14 of the Code of Federal Regulations

{¶ 9} Kent Jackson, an active pilot and aviation lawyer and the author of a number of books explaining federal aviation regulations and other aviation-law matters, was qualified as an expert at the BTA hearing and testified on behalf of Epic. Jackson testified that the federal government's regulation of the aviation industry in this country can be generally divided into two broad categories: (1) economic regulation, which is administered by the United States Department of Transportation ("DOT"), through the Office of the Secretary of Transportation, as the successor to the former Civil Aeronautics Board and (2) safety regulation,

4

which is administered by the Federal Aviation Administration ("FAA"), an agency of the DOT. He stated that obtaining a certificate of public convenience and necessity from the DOT is usually associated with obtaining safety certification under Part 121 of Title 14 of the Code of Federal Regulations ("Part 121") and that Part 298 of Title 14 of the Code of Federal Regulations ("Part 298") provides an exemption from the need for the certificate. As an "air taxi operator," 14 C.F.R. 298.3, AirNet was not required to obtain a certificate of public convenience and necessity.

{¶ 10} Exemption from the requirement of a certificate of public convenience and necessity is associated with safety regulation occurring under Part 135 of Title 14 of the Code of Federal Regulations ("Part 135") rather than under Part 121. Pursuant to its status as an "air taxi operator" under Part 298, AirNet operates as a Part 135 carrier. Part 135 regulations, like Part 121 regulations, impose numerous safety requirements, including limits on how long a pilot can be at the controls. In some respects, safety regulation under Part 135 involves more direct agency oversight than regulation under Part 121, because compliance measures for Part 121 regulations are often performed by the air carrier's own employees, as designated by the FAA.

{¶ 11} To obtain a certificate of public convenience and necessity, an applicant must prove its financial viability. Jackson (admittedly oversimplifying) testified that Part 121 regulation is "for Boeings"—i.e., for larger aircraft and passenger service—and that passenger airlines typically obtain the certificate and fall under the Part 121 regulations. Jackson testified that AirNet probably could not obtain such a certificate even if it applied, because the certificate of public convenience and necessity is not required for the cargo-transport services that AirNet provides and is not appropriate for the types of aircraft that AirNet uses.

{¶ 12} Jackson testified that at one time, economic aspects of airline-passenger service were heavily regulated as to matters such as routes flown and

rates charged. Pursuant to federal deregulation legislation that was fully phased in by 1985, this type of economic regulation was substantially relaxed. By contrast, according to Jackson, "[t]he FAA and the DOT simply don't care if you create a schedule for cargo. They don't regulate that. They never have." But Jackson testified that the air-carrier certificate issued by the FAA nonetheless authorizes "common carrier" service by a cargo-service provider such as AirNet, and that means that "you earn the right to hold out to the public" that you are willing to furnish air-carrier services, "and part of the responsibility of earning that right is the responsibility to do so."

{¶ 13} The record contains AirNet's air-carrier certificate, which expressly authorizes AirNet "to operate as an air carrier and conduct common carriage operations" in accordance with applicable laws and regulations. AirNet's vice president testified that as a common carrier, AirNet must accept packages tendered to it that AirNet has legal authorization to carry and that it operates "without discrimination or any kind of preferential treatment."

## B. The tax commissioner's determination

{¶ 14} The tax commissioner determined that AirNet's purchases of jet fuel did not qualify for exemption. The tax commissioner, relying on *Castle Aviation, Inc. v. Wilkins*, 109 Ohio St.3d 290, 2006-Ohio-2420, 847 N.E.2d 420, found that AirNet's lack of a certificate of public convenience and necessity, along with other similarities to the carrier seeking the exemption in that case, were critical reasons supporting the denial of the exemption. Although Epic attempted to distinguish AirNet from Castle Aviation by pointing to AirNet's regularly scheduled cargo-delivery services, the tax commissioner rejected the point by referring to an FAA order that defines the phrase "scheduled operations" in terms of an operator's provision of passenger services; under the FAA order, an all-cargo operation—such as AirNet—is defined as a "nonscheduled operation." On this basis, the tax commissioner concluded that AirNet's de facto scheduled service was not a factor

6

indicating that it had provided a public-utility service. Although the tax commissioner argues before this court that holding a certificate of public convenience and necessity is a statutory prerequisite for exemption, the tax commissioner never specifically stated that view in his determination.

### C. The BTA's decision

**{¶ 15}** The BTA affirmed the denial of the exemption. Although it recognized that R.C. 5739.01(P) does not make a certificate of public convenience and necessity a prerequisite for AirNet to qualify as a provider of a public-utility service, the BTA nonetheless found that *Castle Aviation*, which was decided before the General Assembly amended R.C. 5739.01(P) by adding the final sentence, essentially controls the present case. The BTA found that "AirNet is not subject to the great degree of 'special regulation and control' " that must exist for it to be a public utility under the analysis in *Castle Aviation*. BTA No. 2012-1557, 2014 WL 5406457, *4 (Sept. 3, 2014), quoting *Castle Aviation*, 109 Ohio St.3d 290, 2006-Ohio-2420, 847 N.E.2d 420, at ¶ 27. The BTA devoted little attention to Epic's argument that AirNet was a common carrier in a manner different from the charter service whose attempt to obtain exemption in *Castle Aviation* was denied.

### III. Analysis

### A. R.C. 5739.01(P) does not condition the exemption on the holding of a certificate of public convenience and necessity

*1. The plain language of R.C. 5739.01(P) does not make the certificate a necessary condition for exemption*

**{¶ 16}** The tax commissioner asserts in his brief to this court (as he did before the BTA) that the holding of a certificate of public convenience and necessity is a prerequisite to public-utility-service exemption from the sales tax. To the extent that that position is based on the wording of the statute, it is clearly unfounded. The plain language of R.C. 5739.01(P) now "includes" the holder of such a certificate among those who qualify for exemption—it does not purport to

exclude those who do not hold a certificate. Epic asserts that the language of the statute makes the holding of a certificate a sufficient condition for exemption, meaning that passenger airlines and cargo carriers that are regulated under Part 121 and hold a certificate will routinely qualify as rendering a "public utility service" under Ohio sales-tax law. We agree with Epic and reject the tax commissioner's view that R.C. 5739.01(P) makes the holding of the certificate a *necessary* condition for the exemption, a position that is inconsistent with the wording of R.C. 5739.01(P) and our precedents.

*2. Castle Aviation should not be construed to broadly preclude application of the exemption to air carriers*

{¶ 17} There is a second element to the tax commissioner's argument that holding a certificate of public convenience and necessity is a required condition for an air carrier to qualify for the public-utility-service exemption: the scope of our decision in *Castle Aviation*, 109 Ohio St.3d 290, 2006-Ohio-2420, 847 N.E.2d 420. In *Castle Aviation*, the claimant was admittedly an air-charter service, but it nonetheless claimed entitlement to the public-utility-service exemption on the grounds that broad-based federal airline deregulation had erased the regulatory distinctions that previously justified denying the exemption to charter services. *See Castle Aviation, Inc. v. Zaino*, BTA No. 2003-M-146, 2005 WL 176679, *8 (Jan. 14, 2005), in which the BTA stated that "Castle argues that * * * the regulations placed upon Part 121 carriers such as Federal Express are now so similar to the regulations placed on Part 135 carriers such as itself that no distinction is warranted." The BTA considered and rejected this claim "in reliance upon the earlier case law," concluding that "Castle does not meet the definition of a public utility," with the result that "its purchases are not excepted from taxation." *Id*.

{¶ 18} In affirming the BTA's decision, this court narrowed the inquiry to focus on what we identified as the most important criterion for public-utility status, which we stated to be "special regulation and control by a governmental regulatory

8

agency." 109 Ohio St.3d 290, 2006-Ohio-2420, 847 N.E.2d 420, at ¶ 27-28. But in light of the general federal deregulation of air carriers' business operations, this approach engendered the possibility that no air carriers could qualify for exemption. This potential implication underlies the tax commissioner's current argument: because it is conceivable (and perhaps even probable) that no air carriers can qualify under the *Castle Aviation* regulatory standard, only those air carriers that enjoy the specific benefit conferred by the 2006 amendment to R.C. 5739.01(P) can be exempted.

{¶ 19} We reject this aspect of the tax commissioner's argument. Doing so requires us to revisit our decision in *Castle Aviation* and to clarify that the ultimate ground for denying the exemption in that case was, as the BTA had stated, that the air-charter service seeking the exemption could not qualify for it under the common-carrier test developed by the earlier case law.

### B. Determining public-utility status calls for determining whether AirNet actually operated as a common carrier

*1. The case law equates public-utility service with common carriage*

{¶ 20} In *R.K.E. Trucking, Inc. v. Zaino*, 98 Ohio St.3d 495, 2003-Ohio-2149, 787 N.E.2d 638, ¶ 18-19, we summed up the longstanding test for public-utility status for motor carriers in a way that is fully applicable to the air carrier in this case. Construing the highway-transportation-for-hire exemption in light of earlier cases involving the public-utility-service exemption, we identified the three criteria for exemption developed by the case law: "(1) the purchaser must be a common carrier, (2) the purchaser must actually be operating as a common carrier, and (3) the primary-use test is to be applied if the property is used both in a way that would make it eligible for the [exemption] and in a way that would make it not eligible." *Id*. at ¶ 22.

{¶ 21} The *R.K.E.* test raises a further question: what is the definition of common carrier as that term is specifically used in the taxation context? As it

happens, the air-carriage cases supply an answer. In affirming the denial of an exemption from sales and use tax to a helicopter-airlift service, the First District Court of Appeals stated that the principal characteristic of a public utility " 'is that of service to, or readiness to serve, an indefinite public, *which has a legal right to demand and receive its services*.' " (Emphasis sic.) *Ohio Valley Air Ways, Inc. v. Bowers*, 114 Ohio App. 427, 428, 177 N.E.2d 303 (1st Dist.1961), quoting 45 Ohio Jurisprudence 2d, Public Utilities, Section 2, at 166 (1960). *Accord Midwest Haulers, Inc. v. Glander*, 150 Ohio St. 402, 405, 83 N.E.2d 53 (1948) ("the principal determinative characteristic of a public utility is that of service to, or readiness to serve, an indefinite public which has a legal right to demand and receive the utility's services or commodities").

**{¶ 22}** This line of reasoning was applied in subsequent BTA decisions involving air carriers. *See, e.g., Marion Air Serv., Inc. v. Bowers*, BTA No. 49695, 1962 Ohio Tax LEXIS 1 (Dec. 20, 1962); *Dade Leasing, Inc. v. Kosydar*, BTA No. C-93, 1974 Ohio Tax LEXIS 1 (Sept. 16, 1974). Among those BTA decisions is one that we affirmed on review: *Castle Aviation, Inc. v. Zaino*, 2005 WL 176679, *aff'd,* 109 Ohio St.3d 290, 2006-Ohio-2420, 847 N.E.2d 420.

*2. The common-carrier test and* Castle Aviation

**{¶ 23}** In *Castle Aviation,* we reviewed a decision of the BTA that affirmed the tax commissioner's denial of the public-utility-service exemption, and we affirmed the BTA's decision. A review of the BTA's decision in that case shows that the record clearly established Castle Aviation's characterization that its entire business involved "charter" service, both as to cargo and as to passengers. 2005 WL 176679 at *2; *see also* 109 Ohio St.3d 290, 2006-Ohio-2420, 847 N.E.2d 420, at ¶ 5-7. Castle Aviation's aircraft and crews were "chartered" in the sense of the "leasing or hiring of an airplane," *Black's Law Dictionary* 284 (10th Ed.2014), or the "hir[ing] or rent[ing]" of an airplane "for temporary use," *id.* at 285. Instead of holding itself out as furnishing a regular cargo-delivery service with announced

times and a hub-and-spoke system, Castle Aviation entered into customer-by-customer or job-by-job contracts. *See* 2005 WL 176679 at *3-5. As the BTA explained in its decision in *Castle Aviation*, "the distinctive characteristic of a common carrier [is] that it undertook to carry for all people, indifferently, as opposed to private carriers, who were not obligated to carry unless the obligation was 'voluntarily assumed by virtue of a special contract.' " *Id.* at *8, quoting *Sundorph Aeronautical Corp. v. Lindley*, BTA No. 82-D-842, 1986 WL 28027, *5 (Jan. 10, 1986). Thus, Castle Aviation was not providing a public-utility service under the parameters set forth in *Ohio Valley Air Ways* and in *Midwest Haulers*.

{¶ 24} In affirming the BTA's decision in *Castle Aviation*, we essentially narrowed the focus to a single criterion, which was "special regulation and control by a governmental agency." *Castle Aviation* at ¶ 27. In doing so, we ignored the common-carrier standard that had previously been established, both for motor carriers and for air carriers, that the BTA had applied in its decision. Moreover, in *Castle Aviation*, we indicated that for an air carrier, the important question is whether there is governmental regulation of the carrier's "business operations." *Id.* at ¶ 28. In light of the general federal deregulation of the economic aspects of the aviation industry, the emphasis on regulatory control articulated in *Castle Aviation* threatened to make it impossible for any air carriers to qualify for the exemption.

{¶ 25} The General Assembly responded to our *Castle Aviation* decision in 2006 by enacting the final sentence of R.C. 5739.01(P) to ensure that Part 121 carriers, i.e., the passenger airlines and cargo carriers that generally use large aircraft, would retain their exemptions. In the final bill analysis for Am.Sub.H.B. No. 699, the Ohio Legislative Service Commission explained that the effect of that amendment to R.C. 5739.01(P) was to provide that the public-utility exemption from sales and use tax applies to "sales of property, fuel, or power used in, or used in the repair and maintenance of, foreign or interstate air transportation of

passengers or property by aircraft as a common carrier for compensation, or in furtherance of the transportation of mail by aircraft."

3. *The common-carrier test should be applied to the jet fuel at issue here, on an apportioned basis*

**{¶ 26}** At oral argument, the tax commissioner's counsel stated that in order to satisfy the economic-regulation test articulated by this court in *Castle Aviation*, Epic would have to show governmental regulation of rates and routes. But uncontroverted expert testimony in this case, along with other evidence, indicates that that type of regulation of air transportation of cargo does not exist. Instead, federal regulations authorize "common carrier" service by a cargo service such as AirNet. According to Jackson, the expert who testified on behalf of Epic, that means that "you earn the right to hold [yourself] out to the public, and part of the responsibility of earning that right is the responsibility to do so."

**{¶ 27}** This testimony is consistent with Ohio's common law. We have stated:

> [T]he tendency and undoubted weight of authority is in favor of the doctrine that a common carrier is charged with a *quasi* public duty to transport merchandise on equal terms for all parties, where the carrying for some shippers at a lower price than for others will create monopoly by injuring or destroying the business of those less favored.

*Scofield v. Lake Shore & Michigan S. Ry. Co.*, 43 Ohio St. 571, 600, 3 N.E. 907 (1885). *See also Morgan Run Ry. Co. v. Pub. Util. Comm.*, 98 Ohio St. 218, 120 N.E. 295 (1918), paragraph one of the syllabus (a railroad organized and operated under the laws of Ohio "is a common carrier under obligation to serve the public without discrimination").

12

**{¶ 28}** Today we revisit *Castle Aviation* and clarify that the proper test to be applied to an air carrier is the common-carrier test that the BTA applied in that case. By extension, that test should be applied in the present case as well. We emphasize that applying that test does not necessarily lead to an all-or-nothing conclusion.

**{¶ 29}** Epic argues that AirNet's entire business is common carriage and thus that all of AirNet's fuel purchases should be exempt from the sales tax, and Epic's counsel contended at oral argument that serving customers by specific contract, or contract carriage, is part of AirNet's common-carrier service, distinct from "private carriage" service, which AirNet, according to Epic's attorney, does not conduct. The record contains an "advisory circular" issued by the FAA, dated April 24, 1986, that addresses the distinction between "private carriage" and "common carriage." That circular defines a "common carrier" as a carrier that " 'holds itself out' to the public, or to a segment of the public, as willing to furnish transportation within the limits of its facilities to any person who wants it." The circular defines "private carriage" narrowly as "[c]arriage for hire" that "does not involve 'holding out,' " and that in general involves "carriage for one or several selected customers, generally on a long-term basis."

**{¶ 30}** We cannot, however, reconcile that distinction with our case law in taxation cases, which uses somewhat different terms and definitions to determine the type of carriage that is exempt from the sales tax for our purposes here. The distinction drawn by our case law is between common carriage, which is exempt, and chartered service, which is not. For example, in *Castle Aviation*, we affirmed the denial of the exemption for an entity that held a certificate authorizing common carriage but that conducted its business as a charter service engaged in contract carriage. 109 Ohio St.3d 290, 2006-Ohio-2420, 847 N.E.2d 420, at ¶ 5-7.

**{¶ 31}** Contrary to an all-or-nothing approach, the case law calls for examining each item that might be taxed in light of the aspect of the taxpayer's

business in which it is used. In *Manfredi Motor Transit Co. v. Limbach*, 35 Ohio St.3d 73, 76, 518 N.E.2d 936 (1988), we held that the exemption in the case of a dual-nature business must be applied on an item-by-item basis through "a review of the entire operation" that questions whether a particular item was used in the portion of the business that qualified as a public-utility service.

{¶ 32} By contrast to the air carrier seeking the exemption in *Castle Aviation*, Schaner, AirNet's vice president, testified that about 60 percent of AirNet's express services during the time period at issue involved nonexclusive, "noncontract" regular-delivery service from one point to another on AirNet's "spaghetti map." Schaner estimated that AirNet conducted "less than half" of its bank services during the time period pursuant to contracts, which means that he believed that more than 50 percent of those deliveries was "noncontract." As to what Schaner described as noncontract regular delivery service, AirNet was clearly providing the services of a common carrier within the meaning of the analysis in *Midwest Haulers* to the extent that those services were made available to the public at reasonable prices "without discrimination or any kind of preferential treatment," as Schaner put it.

{¶ 33} At the other end of the spectrum, as to any services provided by AirNet that constituted chartered service—of the type provided by Castle Aviation in the case in which it sought exemption—AirNet was not providing the services of a common carrier under the standards developed in the case law. Other services provided by AirNet on a contract-by-contract basis would require additional review to determine whether they constituted part of AirNet's "actual operation" as a common carrier. *See Midwest Haulers*, 150 Ohio St. at 406, 83 N.E.2d 53 ("authorization to act as a common carrier does not in and of itself conclusively establish that there is such operation. The actual operation of a business determines its legal status"). We hold that the criteria for common-carrier service that qualifies

14

for exemption is the shipping of cargo at a time and to a place announced to the public in advance and doing so at a reasonable and nondiscriminatory charge.

{¶ 34} Finally, our case law makes special provision for a case that involves jet fuel. Items that are "fungibles," such as the jet fuel here, are subject to specific apportionment, not to an all-or-nothing determination based on the application of a primary-use test. In *B.F. Goodrich Co. v. Lindley*, 58 Ohio St.2d 364, 390 N.E.2d 330 (1979), the BTA had applied a primary-use test to determine that all the taxpayer's fuel purchases at issue were exempt from taxation, because the majority of the fuel was used for an exempt purpose. *See id.* at 367. On appeal, we reversed, holding that "[t]he primary use test does not apply to a sale of fungibles used for both taxable and non-taxable purposes, where such use is apportionable before or after sale." *Id.* at the syllabus.

*4. On remand, the tax commissioner should audit Epic's claim, applying the common-carrier test*

{¶ 35} Throughout this litigation, Epic has argued on behalf of AirNet for a 100 percent exemption from the sales tax and did not submit evidence to establish the portion of the fuel purchases that was used "directly in the rendition of a public utility service" under R.C. 5739.02(B)(42)(a) pursuant to the precedents we discuss and apply in this opinion. Under the general rule applicable to this situation, Epic's failure to raise an apportionment claim normally would constitute a bar to the claim being considered and would also prevent Epic from being afforded the opportunity to present evidence on the point.

{¶ 36} The present circumstances, however, take this case out of the confines of the general rule and bring it within an established exception. The exception applies in situations in which our review on appeal leads us to announce a development or clarification of the law that the parties might reasonably not have anticipated in light of previously existing case law. In *Akron City School Dist. Bd. of Edn. v. Summit Cty. Bd. of Revision*, 139 Ohio St.3d 92, 2014-Ohio-1588, 9

N.E.3d 1004, we recognized for the first time a restriction on the presumption that an arm's-length sale was recent to the tax-lien date. *Id*. at ¶ 26. We noted that "the parties might not have anticipated this innovation." *Id*. at ¶ 28. We stated that when we announce a decision that clarifies and corrects the legal standards that apply in a way that may not have been readily anticipated, "we ordinarily remand with the understanding that the BTA may hear additional evidence" and that the shifting of the burden of production arising from our clarification of the law meant that "the school board should have the opportunity to present evidence if it desires." *Id*. at ¶ 29. Accordingly, we remanded the cause to the BTA with instructions that it permit the taking of new evidence and determine the value of the property in light of the entire record. *Id*. at 30. *See also Woda Ivy Glen Ltd. Partnership v. Fayette Cty. Bd. of Revision*, 121 Ohio St.3d 175, 2009-Ohio-762, 902 N.E.2d 984, ¶ 31-33 (finding that the BTA and the parties "misconstrued" our decision in a previous case, clarifying the proper interpretation of the previous case, vacating the BTA's decision, and remanding to the BTA for it to take additional evidence and hold a new hearing, if necessary); *Cruz v. Testa*, 144 Ohio St.3d 221, 2015-Ohio-3292, 41 N.E.3d 1213, ¶ 50 (vacating the BTA's decision in part and remanding to the BTA to take additional evidence).

{¶ 37} Moreover, we have had occasion to remand a case to the tax commissioner instead of the BTA when our decision has either clarified a legal standard or otherwise effected a change of circumstances in such a way that the determination of a taxpayer's claim should begin anew. *See Timken Co. v. Lindley*, 64 Ohio St.2d 224, 230, 416 N.E.2d 592 (1980); *Hanna Mining Co. v. Limbach*, 20 Ohio St.3d 3, 6, 484 N.E.2d 691 (1985); *Crown Communication, Inc. v. Testa*, 136 Ohio St.3d 209, 2013-Ohio-3126, 992 N.E.2d 1135, ¶ 41.

{¶ 38} Similar reasoning applies here; Epic should have an opportunity to present evidence to establish the portion of the jet fuel purchased by AirNet that is exempt from taxation under the common-carrier standard as it is clarified in this

opinion. Accordingly, we vacate the BTA's decision to deny in its entirety the claim for exemption, and we remand this cause to the tax commissioner with instructions to conduct additional proceedings to determine the exempt portion of the fuel sales pursuant to the common-carrier standard.

### IV. Conclusion

{¶ 39} For the foregoing reasons, we vacate the decision of the BTA and remand the cause to the tax commissioner for further proceedings as indicated in this opinion.

Decision vacated
and cause remanded.

O'CONNOR, C.J., and LANZINGER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

O'DONNELL, J., dissents and would affirm the decision of the Board of Tax Appeals.

_____

Baker & Hostetler, L.L.P., Edward J. Bernert, Elizabeth A. McNellie, and Trischa Snyder Chapman, for appellant.

Michael DeWine, Attorney General, and Daniel G. Kim and Daniel W. Fausey, Assistant Attorneys General, for appellee.

_____