[This opinion has been published in *Ohio Official Reports* at 83 Ohio St.3d 154.]

MIB, INC., APPELLANT, *v.* TRACY, TAX COMMR., APPELLEE.

[Cite as *MIB, Inc. v. Tracy*, 1998-Ohio-117.]

*Taxation—Delaware nonstock membership corporation, consisting of life insurance companies, which collects information from, and provides information to, members concerning applicants for life insurance—Use tax on charges made to Ohio companies for receiving and responding to inquiries for information on life insurance applicants.*

(No. 97-1283—Submitted May 20, 1998—Decided September 23, 1998.)

APPEAL from the Board of Tax Appeals, No. 95-B-109.

_____

{¶ 1} Appellant, MIB, Inc. ("MIB"), formerly Medical Information Bureau, is a Delaware nonstock membership corporation located in Massachusetts. MIB's membership currently consists of six hundred fifty life insurance companies, with about forty of those located in Ohio.

{¶ 2} MIB collects information from, and provides information to, members concerning applicants for life insurance. The information collected from and provided to members by MIB is principally of a medical nature, but also includes some information about lifestyle. Of the over two hundred types of information which MIB has coded for reporting, only five relate to lifestyle. The lifestyle information relates to adverse driving record, participation in hazardous sports, aviation activity, possible overinsurance, and criminal association. The information that MIB collects and distributes comes only from members. This information is used by member companies in their pricing and underwriting of life insurance policies. The goal of MIB's members is to avoid the financial harm that might befall them if an applicant misrepresents or suffers a memory lapse about personal information.

**{¶ 3}** When a member wants to input information to MIB, the member's computer will contact a stand-alone front-end computer at MIB to verify its identity. After identification has been established and the member's data have been transmitted, MIB's front-end computer terminates the communication. MIB's front-end computer stores the data received from members on a disc. Later MIB's front-end computer links up with MIB's host computer and retrieves the data on the disc and transfers the data to the host computer.

**{¶ 4}** The host computer transfers and saves the incoming data to its own disc. Around midnight, the data that have been saved by the host computer during the day are taken off the disc and processed either by opening a new file or combining the data with an existing file. Whether the data furnished by a member about an applicant become a new file or are combined with an existing file is determined in accordance with preset criteria stored in MIB's host computer.

**{¶ 5}** A request for information on an applicant for insurance is made by a member's computer's contacting MIB and identifying itself to MIB's front-end computer. MIB's front-end computer records the request on a disc and terminates the communication with the member. The request for information is transferred from the disc to MIB's host computer. MIB's host computer searches for the requested information and the results of the search are put on a disc at MIB's front-end computer. Finally, MIB's front-end computer contacts the member's computer and transmits the results of the search. Inquiries by members are usually answered in two to five minutes.

**{¶ 6}** The computers and terminals located in members' offices that are used to transmit and receive data are furnished and owned by MIB. With few exceptions, member companies keypunch their input data, which is sent over regular telephone lines to MIB using a code furnished by MIB.

**{¶ 7}** The Tax Commissioner made a use-tax assessment against MIB for charges made to Ohio companies for the audit period January 1, 1989 through

December 31, 1991. The charges being appealed are those made by MIB for receiving and responding to inquiries for information on applicants.

{¶ 8} The Board of Tax Appeals affirmed the Tax Commissioner's assessment.

{¶ 9} This cause is now before the court upon an appeal as of right.

_____

*Bricker & Eckler, LLP, Charles F. Glander, Mark A. Engel* and *Mary W. Leslie*, for appellant.

*Betty D. Montgomery*, Attorney General, and *Barton A. Hubbard*, Assistant Attorney General, for appellee.

_____

***Per Curiam.***

{¶ 10} Appellant first contends that the members' requests for information are not taxable under former R.C. 5739.01(B)(3)(e) because the members do not have direct access to the computer where the information is stored. The essence of MIB's contention is that because the members do not have direct control of the main computer where information is stored, the members do not receive access to its computer equipment. We disagree.

{¶ 11} Although the tax at issue is the use tax, R.C. 5741.02(C)(2) excepts from the application of the use tax the acquisition of tangible personal property and services "which, if made in Ohio, would be a sale not subject to the tax imposed by sections 5739.01 to 5739.31 of the Revised Code." Therefore, we will discuss only whether MIB's transactions with its members are subject to the sales tax.

{¶ 12} During the audit period, R.C. 5739.01(B)(3)(e) provided:

"(B) 'Sale' * * * include[s] all of the following transactions for a consideration * * *:

" * * *

"(3) All transactions by which:

" * * *

"(e) Automatic data processing or computer services are or are to be provided for use in business when the true object of the transaction is the receipt by the consumer of automatic data processing or computer services rather than the receipt of personal or professional services to which automatic data processing or computer services are incidental or supplemental."

{¶ 13} In addition, former R.C. 5739.01(Y)(1) provided:

" 'Automatic data processing and computer services' means: * * * processing of others' data, including keypunching or similar data entry services together with verification thereof; providing access to computer equipment for the purpose of processing data or examining or acquiring data stored in or accessible to such computer equipment * * *. 'Automatic data processing and computer services' shall not include personal or professional services."

{¶ 14} In support of its argument, MIB cites Tax Commr. Op. No. 92-0007 (Apr. 30, 1992), and *PNC Bank, Ohio, N.A. v. Tracy* (July 7, 1995), BTA No. 93-T-1316. After reviewing these cases, we find them not helpful or persuasive because neither is analogous to the fact pattern presented by this case.

{¶ 15} In *Quotron Sys., Inc. v. Limbach* (1992), 62 Ohio St.3d 447, 584 N.E.2d 658, customers were able to access Quotron's computers to receive current pricing information on securities and commodities. In *Amerestate, Inc. v. Tracy* (1995), 72 Ohio St.3d 222, 648 N.E.2d 1336, customers were able to contact Amerestate's computer to download and print the information desired. In both of these cases, we held that the services provided were taxable as automatic data processing and computer services.

{¶ 16} MIB attempts to distinguish its factual situation from *Quotron* and *Amerestate* by pointing out that in those cases the customers had direct access to the database where the information was stored. However, the wording of the statute

does not require that the members have direct access to search MIB's host computer before their transactions can be taxed.

{¶ 17} Prior to the audit period in this case, the definition of "automatic data processing and computer services" in former R.C. 5739.01(Y) did require the vendor to provide "direct access to computer equipment." 140 Ohio Laws, Part II, 2872, 3220. However, in 1985 the General Assembly amended the definition to remove the word "direct." 140 Ohio Laws, Part I, 225, 233.

{¶ 18} During the audit period, former R.C. 5739.01(Y)(1) defined "automatic data processing and computer services" as "providing *access* to computer equipment for the purpose of processing data or examining or *acquiring* data stored in or accessible to such computer equipment." (Emphasis added.) See 142 Ohio Laws, Part I, 1435, 1496.

{¶ 19} The two words in R.C. 5739.01(Y)(1) that are key to our decision are "access" and "acquiring." R.C. 1.42 provides that "[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."

{¶ 20} The word "access," as defined in Webster's Third New International Dictionary (1986), at 11, has several meanings, but the ones most appropriate to the context of this statute are "permission, liberty, or ability to enter, approach, communicate with" and "freedom or ability to obtain or make use of." According to these definitions of "access," MIB's members had "access" to MIB's computer because they had the ability to communicate with and enter and make use of MIB's computer equipment to retrieve the data stored therein.

{¶ 21} The second word of importance in R.C. 5739.01(Y)(1) is "acquiring." Again, the word "acquiring" is not defined in the statute; however, the definition for "acquire" set forth in Webster's Third New International Dictionary at 18 is "to come into possession, control, or power of disposal of often

by some uncertain or unspecified means." The facts in this case clearly show that MIB's members do come into possession of information from MIB's computers. The primary purpose of the members for making an inquiry is to acquire the information stored in MIB's computers concerning applicants.

{¶ 22} Despite the inability of MIB's members to search directly the data stored in MIB's computer, the members had access to MIB's computers. Members were able to access MIB's computer equipment using the equipment in their offices provided by MIB. Despite the inability of the members to search MIB's data files directly, and despite the members' requests being routed through several computers, the members had access to MIB's computers for the purpose of examining and acquiring the data stored therein. As the BTA so aptly put it, "the computers utilized by MIB's members worked in direct concert with the computers at MIB to provide that member with access to the information sought by that member." Thus, the transactions between MIB and its members qualify as automatic data processing and computer services.

{¶ 23} MIB argues next that it is rendering a personal service. In support of this argument, MIB cites three cases: *Credit Bur. of Miami Cty. v. Collins* (1977), 50 Ohio St.2d 270, 4 O.O.3d 439, 364 N.E.2d 27; *Avco Broadcasting Corp. v. Lindley* (1978), 53 Ohio St.2d 64, 7 O.O.3d 145, 372 N.E.2d 350; and *Dun & Bradstreet, Inc. v. Lindley* (1981), 66 Ohio St.2d 295, 20 O.O.3d 280, 421 N.E.2d 525. MIB contends that its activities are similar to those granted exemption in these three cases. We disagree with MIB's analysis.

{¶ 24} The three cases cited by MIB were all decided prior to the enactment of the tax on automatic data processing and computer services in 1983. 140 Ohio Laws, Part II, 2872, 3215. The definition of "automatic data processing and computer services" contained in former R.C. 5739.01(B)(3)(e) includes as a taxable sale a transaction in which the "true object of the transaction is the receipt by the consumer of automatic data processing and computer services rather than the

receipt of personal or professional services to which automatic data processing or computer services are incidental or supplemental." The term "personal or professional services," as used in R.C. 5739.01(B)(3)(e), is defined in R.C. 5739.01(Y)(2). In *ComTech Sys., Inc. v. Limbach* (1991), 59 Ohio St.3d 96, 98, 570 N.E.2d 1089, 1092, we agreed with the Tax Commissioner's statement that if there are automatic data processing and computer services involved, then we have to look to the definition of "personal and professional services" found in former R.C. 5739.01(Y)(2) to determine whether the services are personal or professional. See, also, *CCH Computax, Inc. v. Tracy* (1993), 68 Ohio St.3d 86, 623 N.E.2d 1178.

{¶ 25} R.C. 5739.01(Y)(2) contains a nonexclusive listing, in subparagraphs (a) through (j), of general and specific examples of personal and professional services. However, except for credit information, which we will discuss later, MIB does not refer us to any personal or professional service listed in R.C. 5739.01(Y)(2) as an example of the type of service it provides for its members.

{¶ 26} The general description of personal and professional services contained in R.C. 5739.01(Y)(2)(a) states that these are situations "where the service provider receives data or information and studies, alters, analyzes, interprets, or adjusts such material." The data gathered and reported by MIB are that provided by its members. MIB has not cited any evidence showing that it alters, analyzes, interprets, or adjusts the data provided by its members. The BTA found that "[t]here is no evidence that the members are given an interpretation or analysis of that information." Thus, MIB's activities did not provide personal or professional services within the meaning of R.C. 5739.01(Y)(2).

{¶ 27} MIB's last contention is that its computer services should be exempted as personal or professional services under R.C. 5739.01(Y)(2)(i), which defines as an exempt personal or professional service:

"(i) Providing *credit information* to users of such information by a consumer reporting agency, as defined in the 'Fair Credit Reporting Act,' 84 Stat.

1114, 1129 (1970), 15 U.S.C. 1681a(f), or as hereafter amended, including but not limited to gathering, organizing, analyzing, recording, and furnishing such information by any oral, written, graphic or electronic medium[.]" (Emphasis added.)

{¶ 28} The Tax Commissioner contends that in order to qualify for the exemption set forth in R.C. 5739.01(Y)(2)(i), MIB must show both (1) that it is a consumer reporting agency and (2) that the information it provides is credit information. The Tax Commissioner further contends that MIB does not qualify for the exemption because MIB does not provide access to credit information. We agree with the Tax Commissioner.

{¶ 29} Although R.C. 5739.01(Y)(2)(i) specifically exempts as a personal or professional service providing "credit information," it does not define the latter term. Likewise, the Fair Credit Reporting Act ("FCRA"), Section 1681 *et seq.*, Title 15, U.S.Code, which is referred to in R.C. 5739.01(Y)(2)(i), uses the term "credit information," but also fails to define it.

{¶ 30} MIB contends that the term "credit information" was defined in the context of the FCRA in *Fed. Trade Comm. v. TRW, Inc.* (N.D.Tex.1991), 784 F.Supp. 361. However, review of that case does not confirm MIB's contention. *TRW* involved a consent order agreed to by the parties without trial adjudication of any issue of fact or law. In the consent order the parties stated that "[f]or the purposes of this Order * * * 'Credit Information' means the information TRW maintains bearing on any of the characteristics listed in Sec. 603(d) of the FCRA [See Section 1681a(d), Title 15, U.S.Code] with respect to any Consumer that TRW obtains from Subscribers, court records or any other source and from which TRW creates Consumer Reports." *Id.* at 362.

{¶ 31} By its own terms the definition of "credit information" set forth in *TRW* is limited to the consent order. The facts recited in the *TRW* case do not describe what type of information TRW maintained, or for what purpose the

8

information was used. *TRW* does not establish a definition of "credit information" for purposes of R.C. 5739.01(Y)(2)(i).

**{¶ 32}** MIB further contends that it is a "consumer reporting agency" as defined by FCRA. For purposes of discussion we are willing to accept MIB's assertion. Section 1681a(f), Title 15, U.S.Code defines as a "consumer reporting agency" "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating *consumer credit information or other information* on consumers for the purpose of furnishing *consumer reports* to third parties." (Emphasis added.)

**{¶ 33}** In turn, FCRA defines a "consumer report" in Section 1681a(d)(1), Title 15, U.S.Code as:

"[A]ny written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for—

"(A) credit or insurance * * *."

**{¶ 34}** From the above it can be seen that being a consumer reporting agency does not mean that the information being reported is credit information. A credit reporting agency can provide consumer reports to third parties on "credit information or other information." To determine whether MIB is dealing with credit information we must look at the word "credit." Because "credit" is not defined in R.C. 5739.01(Y)(2)(i), we again follow R.C. 1.42. "Credit" is defined in Webster's Third New International Dictionary at 532, as "the balance in a person's favor in an account; *also:* an amount or limit to the extent of which a person may receive goods or money for payment in the future"; "an amount or sum placed at a person's disposal by a bank **:** a loan of money"; and "time given for payment for goods or services sold for future payment." Black's Law Dictionary

(6 Ed.1990), at 367, defines "credit" as "[t]he ability of a business or person to borrow money, or obtain goods on time, in consequence of the favorable opinion held by the particular lender as to solvency and past history of reliability." All of these definitions of "credit" relate in some way to money. The evidence in this case fails to show that MIB's reports were related to money or credit as opposed to insurance. The information reported by MIB related solely to medical or lifestyle matters, not money matters. One of MIB's witnesses, an underwriter from a member company, was asked if any financial information is communicated, and he said he could not think of any financial information communicated to MIB.

{¶ 35} The evidence clearly established that the information provided by MIB to its members was used to help determine an applicant's eligibility for insurance, not credit. The information provided by MIB to its members was not "credit information" within the meaning of R.C. 5739.01(Y)(2)(i).

{¶ 36} Accordingly, we find the decision of the Board of Tax Appeals to be reasonable and lawful, and we therefore affirm it.

*Decision affirmed.*

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

DOUGLAS, J., concurs in judgment only.

LUNDBERG STRATTON, J., dissents.

————————————

**LUNDBERG STRATTON, J., dissenting.**

{¶ 37} I respectfully dissent. I would find that MIB is exempt from taxation on information that it provides to its members.

{¶ 38} MIB contends that it is a "consumer reporting agency" as defined in the Fair Credit Reporting Act ("FCRA"), Section 1681 *et seq*., Title 15, U.S.Code, and therefore is exempt from taxation pursuant to R.C. 5739.01(Y)(2)(i). The majority, "[f]or purposes of discussion," accepts "MIB's assertion." However, the majority concludes that MIB is not a consumer credit agency for tax purposes

because "[t]he information provided by MIB to its members was not 'credit information' within the meaning of R.C. 5739.01(Y)(2)(i)." I find that the majority's analysis is incomplete.

{¶ 39} As the majority notes, a "consumer reporting agency" is "[a]ny person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or *other information* on consumers for the purpose of furnishing consumer reports *to third parties*." (Emphasis added.) Section 1681a(f), Title 15, U.S.Code.

{¶ 40} Also consistent with the majority's conclusions, a "consumer report" communicates consumer credit or other information regarding the consumer for purposes of establishing the consumer's *eligibility for* "credit or *insurance*." (Emphasis added.) Section 1681a(d)(1), Title 15, U.S.Code.

{¶ 41} In determining whether MIB issues a consumer report, as defined in Section 1681a(d)(1), the majority focuses exclusively on the definition of "credit" in a financial sense only and finds that MIB's reports were not related to credit. The majority ignores the fact that a consumer report may also transmit "other information" for the purpose of "furnishing consumer reports to third parties" in order to "establis[h] the consumer's eligibility for * * * insurance." This is precisely what MIB does. MIB assembles and disseminates information that contains medical and lifestyle information to allow its members to determine an individual's insurance eligibility.

{¶ 42} Thus, I would find that MIB is a consumer reporting agency which is exempt from taxation pursuant to R.C. 5739.01(Y)(2)(i). Accordingly, I would reverse the Board of Tax Appeals.

———————————

11