[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Cincinnati Fed. S. & L. Co. v. McClain*, Slip Opinion No. 2022-Ohio-725.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-725

CINCINNATI FEDERAL SAVINGS & LOAN CO., APPELLANT, *v*. MCCLAIN, TAX COMMR., APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Cincinnati Fed. S. & L. Co. v. McClain*, Slip Opinion No. 2022-Ohio-725.]

*Taxation—A transaction is taxable only when the consumer's true object is to obtain the work performed by computer systems rather than to obtain personal and professional services that are coupled with the work that is performed by computer systems—Decision affirmed in part and vacated in part, and cause remanded.*

(No. 2021-0064—Submitted September 21, 2021—Decided March 15, 2022.)

APPEAL from the Board of Tax Appeals, No. 2018-2247.

_____

**Per Curiam.**

{¶ 1} Appellant, Cincinnati Federal Savings & Loan Co. ("Cincinnati Federal" or "the bank"), challenges a decision of the Board of Tax Appeals

("BTA") that upheld appellee Tax Commissioner Jeffrey McClain's denial of its claim for a sales-tax refund. Cincinnati Federal paid sales tax to Fiserv Solutions, Inc. ("Fiserv"), in connection with compensating Fiserv for services that Fiserv provided to the bank during 2013, 2014, and 2015. Cincinnati Federal argues that the services do not qualify as taxable "automatic data processing" or "electronic information services" but instead constitute nontaxable "personal or professional services." For the reasons stated below, we affirm in part, vacate in part, and remand for further proceedings.

## I. BACKGROUND

### A. Facts

{¶ 2} During the period at issue, Cincinnati Federal received and paid for computerized services provided by Fiserv pursuant to a master agreement. The agreement refers to "account-processing services" of various kinds; according to hearing testimony at the BTA, "the Fiserv system" allows Cincinnati Federal to run transactions on a daily basis and maintains all of the bank's accounting and financial records. Under the agreement, according to Cincinnati Federal's president, Fiserv "maintain[s] the [accounting] system and maintain[s] accounting services * * * on an ongoing basis, real-time basis." Indeed, Fiserv maintains the bank's general ledger at the Fiserv facility in Brookfield, Wisconsin.[1]

{¶ 3} If a customer presents herself at a branch office of the bank and makes a deposit, a withdrawal, or a loan payment, the teller accesses the customer's account and the account is updated immediately by the Fiserv system—and the updating encompasses not only the customer's accounts but also the bank's own

---

1. At the BTA hearing, Cincinnati Federal's expert witness, Scott Deters, a certified public accountant, explained that the "general ledger" is an accounting document on which businesses "accumulate and summarize[] all the activity for a given period of time," using "source documents that are analyzed and determined to be what is the proper accounting"; the general ledger lists "all the assets, all the liabilities, the equity of the company, as well as the income and expense items of a company."

accounts and books, all the way to the general ledger. The Fiserv system does the same for nonteller transactions.

{¶ 4} During the period at issue, Cincinnati Federal regularly received two invoices every month from Fiserv. At the BTA, Cincinnati Federal submitted spreadsheets listing each charge from Fiserv's invoices for the years at issue. For each charge, there was a description of the services, which was taken from the invoices themselves, plus a categorization of the charges according to service functions, which the bank developed for purposes of its tax appeal. Some examples of the categories that were developed by the bank include the Prologue Accounting Platform (the general ledger and ancillary accounting information), Mobility (the mobile-application service offered by the bank), Branch Capture Services (the teller transactions at the bank's branches), and FCN Direct Services (the interbank transactions between banks served by Fiserv). During the BTA hearing, Cincinnati Federal's vice president and chief deposit officer identified isolated charges that specifically related to Fiserv's customization of the software to meet Cincinnati Federal's needs.

### B. Course of proceedings

{¶ 5} In 2016, Cincinnati Federal filed the refund claim at issue, which sought recovery of $57,412.58. The tax commissioner denied the claim in a final determination, rejecting the bank's claims that it purchased nontaxable accounting services or, alternatively, nontaxable customized software.

{¶ 6} Cincinnati Federal appealed the tax commissioner's denial of its refund claims to the BTA. At the BTA hearing, Cincinnati Federal offered the testimony of four witnesses, including the expert testimony of a certified public accountant regarding accounting services. The bank also presented 22 exhibits, including invoices and summaries of the invoices that identify the services relating to the charges.

**{¶ 7}** In its decision affirming the tax commissioner's denial of Cincinnati Federal's refund claim, the BTA first addressed the bank's argument that it had purchased customized software from Fiserv, stating that "software customization is a spectrum" that ranges from a vendor selling "prewritten software with no modifications specific to the purchaser" to a vendor who "creates an entirely new software system from scratch." BTA No. 2018-2247, 2020 WL 7711533, *4 (Dec. 22, 2020). According to the BTA, "[t]he services Fiserv provides are in the middle" of the spectrum. *Id*. The BTA applied the principle that "[e]xclusions are 'strictly construed,' " *id*. at *3, quoting *Satullo v. Wilkins*, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 15, and concluded that Cincinnati Federal's claim must be denied under the principle that exemptions must be denied when "exemption is 'doubtful,' " *id.* at *4.

**{¶ 8}** Next, the BTA addressed Cincinnati Federal's claim that the services Fiserv provides the bank constitute "accounting services," which are tax exempt under R.C. 5739.01(Y)(2)(a). Quoting the tax commissioner's final determination, the BTA held that Fiserv's " 'updating and displaying of information upon input or request of the data respectively is not accounting services; no studying, altering, analyzing, interpreting, or adjusting of the claimant's data or financial material occurs.' " BTA No. 2018-2247, 2020 WL 7711533, at *4.

**{¶ 9}** Cincinnati Federal appealed to this court as of right.

## II. ANALYSIS

### A. The statutes at issue

**{¶ 10}** In 1983, Ohio extended its sales and use tax to purchases of "automatic data processing and computer services." Am.Sub.H.B. No. 291, 140 Ohio Laws, Part II, 2872, 3214-3215, 3220 ("H.B. 291"); *see also* Sub.H.B. No. 794, 140 Ohio Laws, Part II, 4746, 4778, 4785, effective July 6, 1984; R.C. 5739.01(B)(3)(e) and (Y). In 1993, the General Assembly amended the statute to separate "automatic data processing and computer services" into the following

4

categories: automatic data processing ("ADP"), electronic information services ("EIS"), and computer services. Am.Sub.H.B. No. 152, 145 Ohio Laws, Part II, 3341, Part III, 4287, 4294-4295. As a result of the amendments, the "sales" that are subject to tax include transactions in which ADP, EIS, or computer services are "provided for use in business *when the true object of the transaction is the receipt by the consumer of [ADP], computer services, or [EIS]* rather than the receipt of personal or professional services to which [ADP], computer services, and [EIS] are incidental or supplemental." (Emphasis added.) R.C. 5739.01(B)(3)(e).

{¶ 11} R.C. 5739.01(Y)(1)(a) defines ADP as the " 'processing of others' data, including keypunching or similar data entry services together with verification thereof, or providing access to computer equipment for the purpose of processing data." R.C. 5739.01(Y)(1)(c) defines EIS as "providing access to computer equipment by means of telecommunications equipment" for one of two purposes: (1) "[e]xamining or acquiring data stored in or accessible to the computer equipment" or (2) "[p]lacing data into the computer equipment to be retrieved by designated recipients with access to the computer equipment."[2]

{¶ 12} R.C. 5739.01(Y)(2) identifies certain "personal and professional services" that are not subject to the tax on ADP, EIS, or computer services. That section states that " 'personal and professional services' means all services other than [ADP], computer services, or [EIS], including but not limited to" the specific services identified in R.C. 5739.01(Y)(2)(a) through (k).

{¶ 13} In this appeal, Cincinnati Federal argues that Fiserv's services fall into two of those categories. According to Cincinnati Federal, Fiserv provided nontaxable accounting services under R.C. 5739.01(Y)(2)(a) and nontaxable customization of software under R.C. 5739.01(Y)(2)(e).

---

2. R.C. 5739.01(Y)(1)(b) separately defines "computer services," but that particular service is not at issue in this appeal.

**B. Standard of review**

**{¶ 14}** Cincinnati Federal argues that all the service charges it paid to Fiserv are not taxable under both R.C. 5739.01(Y)(2)(a) and (e). But the BTA rejected Cincinnati Federal's argument as to both provisions. In this tax appeal, we determine whether the BTA's decision is reasonable and lawful, deferring to factual determinations of the BTA but correcting legal errors. *N.A.T. Transp., Inc. v. McClain*, 165 Ohio St.3d 250, 2021-Ohio-1374, 178 N.E.3d 454, ¶ 11. The determination by the BTA whether a particular service constitutes taxable ADP or EIS is a question of "ultimate fact" that is subject to our review and redetermination on appeal. *See Marc Glassman, Inc. v. Levin*, 119 Ohio St.3d 254, 2008-Ohio-3819, 893 N.E.2d 476, ¶ 7-8. On the other hand, a determination of the "true object" of a transaction is primarily factual, and we affirm a true-object finding when it is reasonable. *See Amerestate, Inc. v. Tracy*, 72 Ohio St.3d 222, 223-224, 648 N.E.2d 1336 (1995).

**C. With respect to the customization of software, the BTA erred by failing to apply the true-object test**

**{¶ 15}** Cincinnati Federal's first proposition of law claims that the services it purchased were nontaxable under R.C. 5739.01(Y)(2)(e) because they involve customization of software under that division. R.C. 5739.01(Y)(2)(e) describes the following "personal and professional services":

> Designing policies, procedures, and custom software for collecting business information, and determining how data should be summarized, sequenced, formatted, processed, controlled, and reported so that it will be meaningful to management.

**{¶ 16}** In its merit brief, Cincinnati Federal emphasizes that Fiserv customized its software for the bank's use and that the "customization work created

financial statements and a general ledger specific to Cincinnati Federal and not usable by any other business."

{¶ 17} In opposition, the tax commissioner contends that R.C. 5739.01(Y)(2)(e) does not apply because "the transactions that underlie the refund claim are for services that utilize the software—and *not* for the software itself." (Emphasis sic.)  As a factual matter, the tax commissioner's statement is broadly true: the record does not indicate that Cincinnati Federal is buying the software from Fiserv but rather is purchasing the services that are made possible by that software, which remains in Fiserv's computers.   But R.C. 5739.01(Y)(2)(e) addresses more than the creation of custom software *for purchase by the consumer*—it encompasses "[d]esigning * * * custom software for collecting business information" without regard to whether that software *as a product* is sold to the consumer or is used by the designer itself to provide service to the consumer.

{¶ 18} The tax commissioner also contends that "there is no evidence that shows the requisite level of customization of software to justify non-taxable status." Beyond that, he argues that because "the transactions underlying the refund claim are for a variety of taxable [ADP] and [EIS], not for the development of custom software," R.C. 5739.01(Y)(2)(e) cannot be applicable in this case. In this regard, the tax commissioner is arguing in part that adapting existing software to a particular customer's needs simply does not implicate R.C. 5739.01(Y)(2)(e).  But contrary to the tax commissioner's view, R.C. 5739.01(Y)(2)(e) encompasses "determining how data should be summarized, sequenced, formatted, processed, controlled, and reported."  Some of the testimony certainly could support a finding that Fiserv's assistance to the bank included some of those service types in adapting the preexisting software to Cincinnati Federal's particular needs.  Indeed, the BTA acknowledged that Fiserv did modify software to adapt it to Cincinnati Federal's needs.

**{¶ 19}** Consonant with the tax commissioner's findings, the BTA stated that "the Fiserv software is not custom as that term is used in R.C. 5739.01." 2020 WL 7711533 at *3. But unlike the tax commissioner, the BTA went further and found that under R.C. 5739.01(Y)(2)(e), although "Fiserv did not start from scratch" in making its software available for use in connection with the processing of Cincinnati Federal's data, "Fiserv made some modifications [to its software] to account for Cincinnati Federal's needs." 2020 WL 7711533 at *3. The BTA located Fiserv's services "in the middle" of the software-customization "spectrum" that reaches from the purchase of "prewritten software" with no modifications that are specific to the purchaser to a transaction in which the vendor "creates an entirely new software system from scratch." *Id.* at *4. The BTA reached its decision on this point by treating Cincinnati Federal's claim under R.C. 5739.01(Y)(2)(e) as a claim for a tax exemption, and it applied the principle that when a taxpayer makes such a claim, the taxpayer has the burden of proof and in all doubtful cases exemption is denied. *Id.* at *3; *see Anderson/Maltbie Partnership v. Levin*, 127 Ohio St.3d 178, 2010-Ohio-4904, 937 N.E.2d 547, ¶ 16.

**{¶ 20}** We conclude that the BTA erred in two respects. First, it erred by viewing R.C. 5739.01(Y)(2)(e) as a tax exemption. Second, the BTA's application of the stringent test for tax exemptions distracted it from applying the true-object test as required by the statute.

*1. R.C. 5739.01(Y)(2)(e) identifies a separate service and does not function as a tax exemption*

**{¶ 21}** The BTA's principal error is that it viewed the service of software customization under R.C. 5739.01(Y)(2)(e) as an exclusion or exemption from the taxation of ADP and EIS. Quite simply, developing or customizing software is an activity that is distinct from "processing others' data" (ADP) and providing access to data through computer equipment and telecommunications equipment (EIS).

**{¶ 22}** We reject the BTA's premise that R.C. 5739.01(Y)(2)(e) should be construed as a tax exemption for three reasons. First, the list of services in R.C. 5739.01(Y)(2) is by its own terms nonexhaustive: "personal and professional services" is defined as "all services other than automatic data processing, computer services, or electronic information services, *including but not limited to*" those listed in R.C. 5739.01(Y)(2)(a) through (k). (Emphasis added.) If R.C. 5739.01(Y)(2)(a) through (k) were a list of exemptions, then there would be an indefinite number of exemptions that were not explicit—and that is a concept that stands in conflict with the basic tax-law principle that a tax exemption must be expressed in clear and unmistakable terms. *See Application of American Legion*, 151 Ohio St. 404, 408, 86 N.E.2d 467 (1949); *see also N.A.T. Transp., Inc.*, 165 Ohio St.3d 250, 2021-Ohio-1374, 178 N.E.3d 454, at ¶ 15 (to claim a tax exemption, the taxpayer must show that "the statute it relies on clearly expresses the exemption in relation to the facts of its claim").[3]

**{¶ 23}** Second, R.C. 5739.01(B)(3)(e)'s emphasis on the true-object test militates against reading R.C. 5739.01(Y)(2)(a) through (k) as a list of tax exemptions, because the true-object test presupposes a transaction in which two separate services are "bundled" together. The true-object test was developed from statutes that were in effect and cases that were decided before the imposition of sales tax on ADP and EIS. *See* former R.C. 5739.01(B)(5), H.B. 291 (" 'sale' and 'selling' do not include professional, insurance, or personal service transactions which involve the transfer of tangible personal property as an inconsequential

---

3. We have used the term "exemption" in connection with some services listed in R.C. 5739.01(Y)(2). *See MIB, Inc. v. Tracy*, 83 Ohio St.3d 154, 159, 699 N.E.2d 44 (1998) (characterizing the credit-information service described by R.C. 5739.01(Y)(2)(i) as an exempt personal service); *Community Mut. Ins. Co. v. Tracy*, 73 Ohio St.3d 371, 372-374, 653 N.E.2d 220 (1995) (characterizing R.C. 5739.01(Y)(2)(a) as providing an "exemption" for legal services furnished to the taxpayer). The present case does not involve R.C. 5739.01(Y)(2)(i), however, and apart from the use of the word "exemption" in *Community Mut.*, nothing in our consideration of the claim in that case requires us to treat R.C. 5739.01(Y)(2)(a) or 5739.01(Y)(2)(e) as tax exemptions in this case.

element, for which no separate charges are made"); *Servi-Clean Industries, Inc. v. Collins*, 50 Ohio St.2d 80, 85, 362 N.E.2d 648 (1977) (deciding whether personal property or a service is being sold under R.C. 5739.01(B) requires determining the "true object" of the transaction), citing *Accountants Computer Servs., Inc. v. Kosydar*, 35 Ohio St.2d 120, 298 N.E.2d 519 (1973), paragraph two of the syllabus.

{¶ 24} When the General Assembly decided to impose sales tax on ADP and EIS, it defined and carved out those computer-related services as taxable while leaving "personal or professional services" outside the ambit of the tax. Anticipating cases in which different services could be bundled in one transaction, the legislature conditioned the taxability of the whole transaction on determining its true object: a transaction is taxable only when the consumer's true object is to obtain the work performed by computer systems—ADP or EIS—rather than to obtain personal and professional services that are coupled with the work that is performed by computer systems. Accordingly, instead of setting forth a list of exemptions, R.C. 5739.01(Y)(2)(a) through (k) identifies a few of the many personal and professional services that may be bundled with ADP and EIS in a particular transaction.

{¶ 25} Third, R.C. 5739.01(Y)(2)'s use of the term "personal and professional services" connotes services that are performed by people, which are distinct from services performed primarily by computer systems. *See Black's Law Dictionary* 1327 (10th Ed.2014) (defining "personal service" as "[a] beneficial or useful act performed on behalf of another by an individual personally"); *id*. at 1403 (defining "professional" as "[s]omeone who belongs to a learned profession or whose occupation requires a high level of training and proficiency"). The overriding difference between ADP and EIS, on the one hand, and all "personal and professional services" on the other—whether or not those services are specifically listed in R.C. 5739.01(Y)(2)(a) through (k)—is that the latter constitute services performed by individuals, often "professionals," not by computer systems.

10

Accordingly, the list of personal or professional services in R.C. 5739.01(Y)(2)(a) through (k) identifies services that are distinct from ADP and EIS—the list does not set forth a list of exclusions from the definition of ADP and EIS. Consequently, the BTA erred by analyzing Cincinnati Federal's claim as a claim for tax exemption.

*2. The BTA erred by failing to apply the true-object test to the specific service charges at issue*

**{¶ 26}** The BTA explicitly found that "Fiserv made some modifications [to the software] to account for Cincinnati Federal's needs." 2020 WL 7711533 at *4. And Cincinnati Federal does not dispute that Fiserv provided services that are defined as ADP and EIS. Consequently, this case involves "mixed transactions," because Cincinnati Federal purchased *both* ADP and EIS from Fiserv *and* needed Fiserv's software customized for its own use. The BTA should have applied the clear directive of R.C. 5739.01(B)(3)(e) and determined the true object of the transactions by examining whether specific charges related to transactions in which obtaining software customization was the true object of the transaction as opposed to receiving ADP and/or EIS.

**{¶ 27}** Cincinnati Federal advocates an all-or-nothing approach to applying R.C. 5739.01(Y)(2)(e): the bank contends that all the service charges it paid may qualify as software customization. For his part, the tax commissioner mistakenly contends that R.C. 5739.01(Y)(2)(e) may not be applied at all. But the record in this case both permits and requires a more refined analysis: there is extensive evidence in this record regarding the charges and the services from Fiserv, and that evidence may support the conclusion that some charges relate primarily to the provision of ADP and EIS while others relate primarily to the customization of software. *See Epic Aviation, L.L.C. v. Testa*, 149 Ohio St.3d 203, 2016-Ohio-3392, 74 N.E.3d 358, ¶ 31-33 (rejecting an all-or-nothing approach, this court held that the taxability of an aviation company's fuel purchases should be determined

according to whether each fuel purchase related to the taxpayer's exempt common-carrier service or its taxable chartered service).

{¶ 28} In *ComTech Sys., Inc. v. Limbach*, 59 Ohio St.3d 96, 98-99, 570 N.E.2d 1089 (1991), we held that when ADP or EIS is involved in a transaction, that transaction is presumed taxable, subject to rebuttal by the taxpayer. In this case, Cincinnati Federal should be permitted to argue on the basis of the record it developed in this case that it has rebutted the presumption with respect to some of the service charges that it paid. We therefore vacate the BTA's decision with respect to R.C. 5739.01(Y)(2)(e), and we remand this cause with the instruction that the BTA must apply the true-object test to determine the taxability of the service charges.

**D. ADP and EIS remain taxable even though they are associated with accounting**

{¶ 29} Cincinnati Federal's second proposition of law claims that the services it purchased were nontaxable under R.C. 5739.01(Y)(2)(a) because they involve accounting services under that division. R.C. 5739.01(Y)(2)(a) describes the following "personal and professional services":

> Accounting and legal services such as advice on tax matters, asset management, budgetary matters, quality control, information security, and auditing and any other situation where the service provider receives data or information and studies, alters, analyzes, interprets, or adjusts such material.

{¶ 30} For the reasons that follow, we reject Cincinnati Federal's argument.

*1. Cincinnati Federal's replacement theory is a tax-exemption theory*

{¶ 31} At oral argument, Cincinnati Federal clarified that it does not dispute that Fiserv provides services that are defined as ADP and EIS. Fiserv receives data

from Cincinnati Federal and its customers and processes that data with its computers while making it available to the bank through telecommunications equipment.

**{¶ 32}** Cincinnati Federal's accounting-services argument relies on a "replacement" theory: in its merit brief, Cincinnati Federal maintains that it "replaced a portion of the internal accounting department and an external traditional accounting/bookkeeping firm by use of the accounting services of Fiserv." At the BTA hearing, Cincinnati Federal's president testified that "Fiserv provides [the bank's] accounting system. They provide accounting services, maintain the system and maintain accounting services * * * on an ongoing basis, real-time basis." He confirmed that Fiserv's services include maintaining the general ledger.

**{¶ 33}** Deters, Cincinnati Federal's accounting expert, opined that providing a general ledger is an "accounting service" because it involves "summarizing the transactions, analyz[ing] and determin[ing] transactions, determining where they should be posted, what the proper accounting is, all of that would be considered an accounting service." According to Deters, an accounting service is an accounting service whether it is provided by computer systems or performed by "an office full of accountants poring over books."

**{¶ 34}** Thus, under its replacement theory, the bank argues that even though the services fit the definitions of ADP and EIS, they are specially excluded from taxation by virtue of R.C. 5739.01(Y)(2)(a) because they replace accounting services that would otherwise be provided by individuals.

**{¶ 35}** As already discussed, however, we do not read R.C. 5739.01(Y)(2)(a) through (k) primarily as setting forth a list of tax exemptions. Just as R.C. 5739.01(Y)(2)(e) identifies a distinct service of software customization performed by individuals, R.C. 5739.01(Y)(2)(a) describes specific services *performed by individuals* that may be bundled with ADP or EIS in a particular transaction.

*2. Because Fiserv did not provide any accounting services that were performed by individuals, the ADP and EIS it did provide are taxable services*

**{¶ 36}** In evaluating Cincinnati Federal's claim under R.C. 5739.01(Y)(2)(e), we concluded that the BTA erred by not performing the true-object test with respect to individual charges the bank paid to Fiserv. Here, we reach a different conclusion.

**{¶ 37}** Unlike R.C. 5739.01(Y)(2)(e), R.C. 5739.01(Y)(2)(a) does not trigger the need to perform the true-object test in this case. As Cincinnati Federal's counsel conceded at oral argument, the record contains no evidence that Fiserv employs accountants who supply services to Cincinnati Federal, nor is there any evidence that any individuals employed by Fiserv provide the bank with an accounting-analysis service. Also, when asked at oral argument to identify evidence that Fiserv studies, alters, or analyzes data that is generated by Cincinnati Federal, counsel relied on Fiserv's "provision of a general ledger on a real-time basis," which requires "continuing computer-based analysis of data that's inputted." Thus, the bank concedes that the only "analysis" that is provided by Fiserv is the processing of data by computers in accordance with protocols that are written into the software. It follows that Fiserv's services are not "personal services" because they do not involve accounting-related services performed by individuals. Therefore, Fiserv's services do not fall within the services described by R.C. 5739.01(Y)(2)(a).

**{¶ 38}** The record provides even less of a basis for construing Fiserv's services as "professional services" under R.C. 5739.01(Y)(2). Significantly, during the BTA hearing, Deters testified on cross-examination that Cincinnati Federal—not Fiserv—had to provide its financial statements (what he termed a "call report") to regulatory authorities, and he acknowledged that Fiserv could not provide that kind of certification because doing so would be "an audit service and to be an audit that's different than accounting. * * * Our [certified-public-accountant] firm can

provide audit services. A non [certified public accountant] could not provide an audit service. They're not licensed to do so." Deters thereby revealed that Fiserv's alleged "accounting services" did not include any activities requiring professional licensure.

{¶ 39} Because Fiserv did not furnish accounting services in the sense of services performed by individuals, and because Fiserv lacked the legal authority to provide professional accounting services that require licensure, this case does not present a "bundled transaction" when analyzed under R.C. 5739.01(Y)(2)(a). As a result, the ADP and EIS provided by Fiserv are taxable sales, and R.C. 5739.01(Y)(2)(a) does not apply to this situation. Even though the BTA erred by treating R.C. 5739.01(Y)(2)(a) as a tax exemption, we affirm the BTA's conclusion that Cincinnati Federal failed to prove it had purchased nontaxable accounting services from Fiserv.

### 3. *The* Genuine Parts *case is not controlling*

{¶ 40} In its merit brief, Cincinnati Federal relies heavily on our decision in *Genuine Parts Co. v. Limbach*, 62 Ohio St.3d 93, 579 N.E.2d 486 (1991), to support its argument that Fiserv provides accounting services under R.C. 5739.01(Y)(2)(a). In that case, we reversed the BTA's determination that the services at issue were taxable as ADP and computer services, because they were incidental or supplemental to the accounting and financial services that had been provided.

{¶ 41} Cincinnati Federal analogizes Fiserv's services to those provided in *Genuine Parts*, but the suggested parallel fails because the range of services that were at issue in *Genuine Parts* went well beyond the processing of accounting data. Indeed, in that case, the BTA noted that the service provider acted "as a full service bookkeeping, accounting, and tax department" for its customers. *Genuine Parts Co. v. Limbach*, BTA No. 88-A-321, 1990 WL 211922, *1 (Nov. 2, 1990), *rev'd*, 62 Ohio St.3d 93, 579 N.E.2d 486. Although we reversed the BTA's legal conclusion, we agreed with its factual findings, noting that the service provider in

*Genuine Parts* "reconciles bank statements and writes checks to pay [its customers'] invoices and employees" while also "inform[ing] [its customers] regarding tax law changes and answer[ing] individual questions regarding management, bookkeeping, and accounting functions." 62 Ohio St.3d at 93. By stark contrast, the record in the present case shows that Fiserv provided computerized data processing along with support for the computerized services, but it did not furnish the range of services at issue in *Genuine Parts*.

**{¶ 42}** For the foregoing reasons, we affirm the board's conclusion that Cincinnati Federal failed to prove that Fiserv provided nontaxable accounting services.

**E. The evidentiary record contains support for the denial of Cincinnati Federal's claim that it purchased nontaxable accounting services**

**{¶ 43}** Cincinnati Federal's third proposition of law argues that the BTA's decision is unreasonable and unlawful, because it is not supported "by any probative evidence" in the record. This court "will reverse BTA findings only when there is a total absence of evidence to support a particular finding." *HealthSouth Corp. v. Testa*, 132 Ohio St.3d 55, 2012-Ohio-1871, 969 N.E.2d 232, ¶ 14.

**{¶ 44}** Cincinnati Federal first challenges the BTA's statement that Fiserv customized data, not software, for the bank. 2020 WL 7711533 at *3. But this passage of the BTA's decision is inconsequential because the BTA found that Fiserv did make modifications to its preexisting software in connection with serving Cincinnati Federal; and as this opinion has already discussed, this finding should have led the BTA to apply the true-object test.

**{¶ 45}** Second, Cincinnati Federal contends that the BTA ignored expert and fact testimony indicating that Fiserv was providing accounting services. But the witnesses' characterization of the services as accounting services, though factually helpful, is not legally determinative. An expert's interpretation of the law is not admissible as such because the interpretation of the law is the province of the

16

tribunal. *See State ex rel. Parisi v. Dayton Bar Assn. Certified Grievance Commt.*, 2017-Ohio-9394, 103 N.E.3d 179, ¶ 29 (2d Dist.), *aff'd*, 159 Ohio St.3d 211, 2019-Ohio-5157, 150 N.E.3d 43. We reject Cincinnati Federal's third proposition of law.

## III. CONCLUSION

{¶ 46} For the foregoing reasons, we affirm the BTA's rejection of Cincinnati Federal's refund claim under R.C. 5739.01(Y)(2)(a). As for the refund claim under R.C. 5739.01(Y)(2)(e), we vacate the BTA's decision and remand this cause with the instruction that the BTA apply the true-object test to the service charges at issue.

Decision affirmed in part

and vacated in part,

and cause remanded.

O'CONNOR, C.J., and FISCHER, DONNELLY, STEWART, and BRUNNER, JJ., concur.

DEWINE, J., concurs in judgment only, with an opinion joined by KENNEDY, J.

_____

**DEWINE, J., concurring in judgment only.**

{¶ 47} I concur in the judgment of the majority. But I write separately to express my disagreement with the majority's apparent assumptions that the ordinary rules of statutory construction do not apply when it comes to tax exemptions and that taxpayers who argue for exemptions must meet an especially high burden. In my view, the same rules of construction that apply to any other statute also apply to a statute that provides a tax exemption. There is no justification for a judge-made rule that puts a thumb on the scale in favor of the government and against the taxpayer when a tax exemption is at issue.

{¶ 48} Cincinnati Federal Savings & Loan Co. requested a tax refund on the basis that it had purchased customized software. In denying the request, the Board

of Tax Appeals relied on the principles that "[e]xclusions are 'strictly construed,' " BTA No. 2018-2247, 2020 WL 7711533, *3 (Dec. 22, 2020), quoting *Satullo v. Wilkins*, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 15, and that "in all doubtful cases the exemption is denied," *id.* at *3, citing *Anderson/Maltbie Partnership v. Levin*, 127 Ohio St.3d 178, 2010-Ohio-4904, 937 N.E.2d 547, ¶ 16. The majority accepts the BTA's premise (that taxpayers who argue for an exemption face an uphill climb) but concludes that the principle does not apply here because the tax provision at issue is not an exclusion. *See* majority opinion at ¶ 18-19.

{¶ 49} I take issue with the premise. It is true that one can find in this court's caselaw various statements suggesting that the deck is stacked against the taxpayer when it comes to statutes exempting property or transactions from taxation. *See, e.g.*, *N.A.T. Transp., Inc. v. McClain*, 165 Ohio St.3d 250, 2021-Ohio-1374, 178 N.E.3d 454, ¶ 15 (the taxpayer has the burden to prove that the law "clearly expresses the exemption in relation to the facts of its claim"); *Anderson/Maltbie Partnership* at ¶ 16 ("laws that exempt property from tax * * * must be strictly construed"); *Campus Bus Serv. v. Zaino*, 98 Ohio St.3d 463, 2003-Ohio-1915, 786 N.E.2d 889, ¶ 8 (same); *Satullo* at ¶ 15 (same); *but see Columbia Gas Transm. Corp. v. Levin*, 117 Ohio St.3d 122, 2008-Ohio-511, 882 N.E.2d 400, ¶ 34 ("a statute that imposes a tax requires strict construction against the state, with any doubt resolved in favor of the taxpayer").

{¶ 50} But our responsibility is no different in interpreting a tax statute than any other statute: to apply the plain meaning of the statute as it would have been understood by an ordinary speaker of the English language at the time of the law's enactment. Unless the legislature has explicitly provided otherwise, the traditional rules of statutory construction apply.

{¶ 51} The idea that special rules apply to tax exemptions seems to be a relic of 19th-century federal caselaw dealing with the Contracts Clause of the

United States Constitution and limitations on intrusions into state sovereignty. *See* Scalia and Garner, *Reading Law: The Interpretation of Legal Texts* 359-363 (2012). Indeed, Scalia and Garner's treatise devotes an entire chapter to dispelling "[t]he false notion that tax exemptions—or any others for that matter—should be strictly construed." *Id.* at 359. As the treatise explains, the United States Supreme Court has largely abandoned the notion that tax statutes should be treated different than other legislative enactments. *Id.* at fn. 5 and 6. We should do the same.

{¶ 52} Rather,

> [l]ike any other governmental intrusion on property or personal freedom, a tax statute should be given its fair meaning, and this includes a fair interpretation of any exceptions it contains. So when one statutory provision imposes a categorical tax, any exception imported by another provision must be clear. But it can be clearly implied, no less than clearly expressed, and the terms of the exception ought to be reasonably, rather than strictly, construed.

*Id.* at 362.

{¶ 53} The state's sales-tax regime does provide some interpretative guidance. R.C. 5739.02(C) says: "For the purpose of the proper administration of this chapter, and to prevent the evasion of the tax, it is presumed that all sales made in this state are subject to the tax until the contrary is established." *See also* R.C. 5741.02(G) (same for use tax). But this simply means that the taxpayer bears the burden to establish that a sales transaction is nontaxable. *Basic Inc. v. Levinson*, 485 U.S. 224, 245, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("presumptions are also useful devices for allocating the burdens of proof between parties"). Nothing in the statute changes the ordinary rules of construction. Tax statutes should be read through a clear lens, not one favoring tax collection.

**{¶ 54}** Ultimately, I agree with the majority that this case should be remanded to the BTA to apply the true-object test to Cincinnati Federal's claim for a refund under R.C. 5739.01(Y)(2)(e). I also agree that the BTA was correct in denying Cincinnati Federal's refund claim under R.C. 5739.01(Y)(2)(a). But I reject the majority's implicit assumption that special rules of construction disfavoring taxpayers apply in cases involving tax exemptions.

KENNEDY, J., concurs in the foregoing opinion.

————————————

Mann & Mann, L.L.C., David S. Mann, and Michael T. Mann, for appellant.

Dave Yost, Attorney General, and Christine Mesirow, Assistant Attorney General, for appellee.

————————————